## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## BEAUFORT DIVISION

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | Criminal No.: 9:05-cr-00928 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| John H. Kang, | ) | |
| John P. Sessions, | ) | **ORDER and OPINION** |
| | ) | |
| Defendants. | ) | |
| | ) | |

This matter is before the court on defendants' motion for judgment of acquittal under Federal Rule of Criminal Procedure 29. On February 18, 2010, defendants filed their motion at the close of the government's case. The government filed a response in opposition to defendants' motion on February 19, 2010. The court heard argument on the motion and took the matter under advisement. Following a jury verdict of guilty as to both defendants, the court requested that the parties submit supplemental briefing on this matter. On April 13, 2010, the court heard argument on the issue of whether the statute of limitations had run and that the prosecution of defendants for the alleged conspiracy was untimely. For the reasons set forth below, the court holds that the statute of limitations for the conspiracy charged in Count One of the Second Superseding Indictment had expired because the objectives of the conspiracy were achieved with the Medical Manager/Synetic/WebMD merger in September 2000, and the overt acts relied on by both the government and the jury may not "properly be regarded as in furtherance of the conspiracy." Grunewald v. United States, 353 U.S. 391, 397 (1957).

1

# I. BACKGROUND

On December 15, 2005, a grand jury returned a seven count superseding indictment against officers and/or employees of Medical Manager Corporation,[1] including Messrs. John H. Kang and John P. Sessions. The indictment charged all defendants with conspiracy to commit mail, wire, and securities fraud in violation of Title 18, United States Code, Section 371.[2] The indictment also charged all defendants with conspiracy to commit money laundering in violation of Title 18, United States Code, Section 1956(h). The indictment charged Mr. Sessions individually with five counts of money laundering in violation of Title 18, United States Code, Section 1957.[3] On February 27, 2007, a Second Superseding Indictment was returned. In that indictment, the government alleged 119 overt acts in furtherance of the conspiracy to commit mail, wire, and securities fraud.

The Second Superseding Indictment alleges five principal purposes to the alleged conspiracy:

> (a) to manipulate the revenue and earnings of Medical Manager in order to fraudulently inflate the market price of Medical Manager and WebMD stock;
> (b) to make Medical Manager an artificially attractive acquisition target;
> (c) to use the fraudulently inflated price of Medical Manager stock to facilitate the acquisition of target companies by Medical Manager which in turn would enable further fraudulent inflation of Medical Manager's

---

[1]The original indictment named the following defendants: Mr. Michael Singer, Mr. Lee Robbins, Mr. Frederick Karl, Mr. David Ward, Mr. Charles Hutchinson, Mr. Ted Dorman, Mr. Franklyn Krieger, and Mr. Maxie Juzang.

[2]Unlike certain money laundering or drug conspiracies, a conspiracy under 18 U.S.C. § 371 explicitly requires proof of an overt act in furtherance of the conspiracy. See United States v. Bolden, 325 F.3d 471, 491 (4th Cir. 2003).

[3]On August 10, 2009, the court granted the government's motion to dismiss Count Two and sever Counts Three through Seven, the individual money laundering counts against Mr. Sessions. Dkt. 746.

earnings;

(d) to conceal such fraud by:

    (i) making false statements to Medical Manager and WebMD executives, outside auditors, and investigators;

    (ii) concealing evidence of their and their conspirators' misconduct from Medical Manager and WebMD executives, investigators, and outside auditors; and

    (ii) continuing to meet analyst expectations through fraudulent means; and

(e) to personally enrich the defendants and others through various means including but not limited to, salary, bonuses, stock option grants, and capital appreciation of their Medical Manager and WebMD stock.

(Second Superseding Indictment ¶ 26.)

In Spring 2009, after years of discovery, legal maneuvering, and various other obstacles, the case began moving towards trial.[4] Numerous pre-trial motions were filed, and the court and the parties estimated the trial would last four to six months. As a result of the demands of the anticipated lengthy trial, in August 2009, the case was transferred to the undersigned who scheduled the trial to begin on January 19, 2010.

Surprisingly, after four years under indictment and shortly before trial, the government dismissed several defendants.[5] On November 25, 2009, the court granted the

---

[4]By this stage in the litigation, Mr. Robbins had passed away. Additionally, because of his wife's health, on March 3, 2009, the court granted a change of venue to Mr. Hutchinson and transferred his case to the Middle District of Florida.

[5]The court acknowledges that decisions are sometimes made in the interest of streamlining a case for trial. However, after such a fully developed record as to the alleged involvement of a number of these individuals, it is not at all clear to the court why Mr. Kang and Mr. Sessions were the two remaining defendants. Two trial dates had previously been set in this case. If the evidence did not support bringing the other defendants to trial, surely that was known to someone with some authority and/or discretion long before November and December 2009. Thus, if streamlining the case for trial was the sole justification for dismissing the other defendants, the court is curious as to the rationale for keeping the dismissed defendants under indictment for such an extended period of time at a cost of tens of millions of dollars spent on behalf of these defendants. In August 2009, several months

government's motion to dismiss the indictment against Mr. Dorman. On December 22,

2009, the court granted the government's motion to dismiss the indictment against Mr. Karl.

On December 22, 2009, the court also granted Mr. Krieger's motions to sever and for change

of venue, and transferred his case to the Middle District of Florida. On December 23, 2009,

the court granted the government's motion to dismiss the indictment against Mr. Ward.

Additionally, on January 12, 2010, the same day as jury selection, the government and Mr.

Singer[6] entered into a deferred prosecution agreement.[7]

---

before some defendants were dismissed and before the lengthy trial, the defense costs totaled $110,000,000. See HLTH Corp. v. Clarendon Nat. Ins. Co., 2009 WL 2849777, *1 (Del. Super. Ct. August 31, 2009). The director and officer liability insurance policies totaled $190,000,000. See Health Corp. v. Clarendon Nat. Ins. Co., 2009 WL 2215126, *3 (Del. Super. Ct. July 15, 2009). It is the court's understanding that this coverage was exhausted prior to trial, which if true, would make this prosecution probably the most expensive case in the history of the world. "[U]nder certain circumstances, amounts advanced by the insurance companies in connection with the defense costs of the indicted individuals may have to be repaid by [WebMD] . . . ." WebMD Health Corp., Annual Report (Form 10-K), at F-32 (March 2, 2010). As of November 2009, WebMD continued to incur significant litigation costs related to the indictment of defendants. See WebMD Health Corp., Quarterly Report (Form 10-Q), at 58 (November 9, 2009). WebMD could not determine "what portion may ultimately be covered by insurance or may ultimately be repaid by individuals to whom [WebMD] [] advanc[ed] amounts for their defense costs." Id. Ironically, if defendants' convictions were legally sufficient, an alleged "victim," WebMD, could be victimized again if it were required to repay the costs of defending this case to the director and officer insurance companies. That being said, these dismissals and the years of hard work of agents by the FBI, IRS, etc., and the skilled representation of the lawyers for each side resulted in a much more efficient trial that lasted just seven weeks.

[6]Interestingly, from the outset of this case, the government maintained that Mr. Singer was the lead defendant and mastermind of the alleged conspiracy, and that his ill-gotten gains totaled fifteen million dollars. There was ample testimony at trial that Mr. Singer was intimately involved with Medical Manager and was a very active "micromanager" of the company. The statement of facts signed by Mr. Singer makes clear that, although Mr. Singer believed at the time that the accounting adjustments and bulk software sales complied with Generally Accepted Accounting Principles ("GAAP"), he now understands that some of them were improper. (Dkt. 894.) Notably, Mr. Singer's "belief at the time" negates any criminal intent or knowledge as to the unlawful purpose of the

On January 19, 2010, a jury trial began with the two remaining defendants, Mr. Kang and Mr. Sessions. At the conclusion of the trial, the court instructed the jury on the applicable law and provided each juror with a copy of the instructions. The closing instructions included a jointly agreed-upon list of the overt acts the jury could consider. Of the eighty-two acts listed in the instructions, only the following four occurred within the statute of limitations period:

> 166. During an interview with WebMD's lawyers on or about July 15, 2003, Sessions concealed the nature of the accounting fraud at Medical Manager, specifically that certain Dealer acquisitions were structured with the specific intent of securing the financial results necessary to make quarterly revenue and earnings targets.
>
> 167. During an interview with WebMD's lawyers on or about July 15, 2003, Sessions concealed his own involvement in another fraudulent transaction, the Raven deal, and provided a false version of what occurred.
>
> 168. During an interview with WebMD's lawyers on or about August 26, 2003, Kang stated falsely that: a) Medical Manager's acquisitions were always recorded in accordance with generally accepted accounting principles; b) the Dealer acquisitions were always presented to the auditors before being recorded in Medical Manager's accounting system; and c) concealed the fact that specific Dealer acquisitions were structured specifically to make the quarterly revenue and earnings targets.
>
> 169. During an interview with WebMD's lawyers on or about August 26, 2003, Kang further concealed his own involvement with the Raven deal and the fact that the deal was fraudulently structured to falsely inflate Medical Manager's revenue and earnings.

(Second Superseding Indictment ¶¶ 166-169.)

Defendants raised the statute of limitations as an affirmative defense at the close of the government's case-in-chief. Defendants contend that there was no evidence that an overt act in furtherance of the charged conspiracy occurred within the relevant statute of

---

alleged conspiracy, hence a basis for his deferred prosecution agreement.

[7] The court allowed the Deferral of Prosecution on January 13, 2010.

limitations period. According to defendants, because there was no overt act in furtherance of the conspiracy during the limitations period, there was insufficient evidence to support a conviction on Count One as to either Mr. Kang or Mr. Sessions.

In response, the government maintains that there was an express original agreement to conceal the conspiracy after its commission.[8]  Alternatively, the government argues that the existence of an express agreement to conceal is irrelevant because at the time of the Glick interviews in 2003, the conspiracy was ongoing because defendants had not achieved the alleged purposes of concealment[9] and obtaining personal enrichment.

## II.  STANDARD OF REVIEW

### A. Motion for Judgment of Acquittal

Federal Rule of Criminal Procedure 29 provides that "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  The rule also permits the court to "reserve decision on the motion, proceed with the trial . . . submit the case to the jury, and decide the motion either before the jury returns a verdict or after it returns a verdict of guilty or is discharged without having returned a verdict."  Fed. R. Crim. P. 29(b).  A court may set aside the verdict of guilty and enter an acquittal.  Fed. R. Crim. P. 29(c)(2).

---

[8]It does not appear that the government had argued the existence of such a conspiracy prior to defendants' Rule 29 motion.

[9]Arguably, the purpose of concealment had been achieved because no one had any inkling of an alleged conspiracy by these defendants to commit accounting fraud at Medical Manager until Bobby Davids walked into the FBI office in September 2003.

"A judgment of acquittal based on the insufficiency of evidence is a ruling by the court that as a matter of law the government's evidence is insufficient 'to establish factual guilt' on the charges in the indictment." United States v. Alvarez, 351 F.3d 126, 129 (4th Cir. 2003). "The test for deciding a motion for a judgment of acquittal is whether there is substantial evidence . . . which, taken in the light most favorable to the prosecution, would warrant a jury finding that the defendant was guilty beyond a reasonable doubt." United States v. MacCloskey, 682 F.2d 468, 473 (4th Cir. 1982).

**B. Statute of Limitations**[10]

According to the Supreme Court:

[t]he purpose of a statute of limitations is to limit exposure to criminal prosecution to a certain fixed period of time following the occurrence of those acts the legislature has decided to punish by criminal sanctions. Such a limitation is designed to protect individuals from having to defend themselves against charges when the basic facts may have become obscured by the passage of time and to minimize the danger of official punishment because of acts in the far-distant past.[11] Such a time limit may also have the

---

[10]During its closing argument, the government referred to the statute of limitations as a "technicality." (Trial Tr. vol. 26, 5565, February 25, 2010.) While a layperson may find such a characterization appealing, the government, defendants, and this court are required to apply the law as it exists. Congress has made the determination that the statute of limitations is no more or less important in a criminal case than the applicable substantive law.

[11]The case before this court epitomizes the policy justifications for a statute of limitations as expressed by the Supreme Court. Mr. Davids is the individual who self-reported the alleged conspiracy to commit accounting fraud after WebMD uncovered his own separate multi-million dollar kickback scheme. Although he could not conclusively remember the year he graduated from college (Trial Tr. vol. 2, 621, January 21, 2010), from 1997-1999, Mr. Davids was apparently quite the criminal multitasker as he not only carried out his own criminal enterprise, including kickbacks and money laundering (which included wooing, seducing, and buying a house for the personal assistant to Messrs. Kang and Sessions, Shelby Stilp, in order to obtain upper management information) (Trial Tr. vol. 6, 2190-92, January 26, 2010), while performing his legitimate employment, but also alleged

salutary effect of encouraging law enforcement officials to investigate suspected criminal activity. For these reasons and other, we have stated before the principle that criminal limitations statutes are to be liberally interpreted in favor of repose.

Toussie v. United States, 397 U.S. 112, 114 (1970) (internal quotations omitted).

The jury trial in this matter involved a single count of conspiracy to commit mail, wire and securities fraud in violation of Title 18, United States Code, Section 371. Title 18, United States Code, Section 3282(c) provides that "[e]xcept as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed." Thus, the applicable limitations period for the crime charged is five years. "The government bears the burden of proving that it began its prosecution within the statute of limitations period." United States v. Wilson, 118 F.3d 228, 236 (4th Cir. 1997). However, because the statute of limitations is an affirmative defense, it must be raised by defendant at trial. See Biddinger v. Commissioner of Police of City of New York, 245 U.S. 128, 135 (1917).

To satisfy the statute of limitations, an overt act must be alleged in the indictment and proved at trial. See United States v. Head, 641 F.2d 174, n.5 (4th Cir. 1981); United States v. Davis, 533 F.2d 921 (5th Cir. 1976). In Davis, the Fifth Circuit held "that for purposes

_____

that he implemented the conspiracy to commit accounting fraud on behalf of a number of executives at Medical Manager. The criminal conspiracy allegedly began in 1997 and according to the government's theory, lasted six years. After five years of debriefing, reviewing documents with the government, interviews, and trial preparation, it would have been a waste of judicial resources to actually count the number of times Mr. Davids was unable to provide a concrete answer to defense counsel's questions some thirteen years after the fact.

of the statute of limitations the overt acts alleged in the indictment and proved at trial mark the duration of the conspiracy." Davis, 553 F.2d at 929. Adopting Davis, the Fourth Circuit noted: "The government also contends that the jury need not have been instructed to find an overt act alleged in the indictment within the limitations period, but could have avoided the bar of limitations by finding unpled acts. We disagree." Head, 641 F.2d at 178, n.5.

The grand jury returned the First Superseding Indictment naming defendants Kang and Sessions on December 15, 2005. Thus, the government was required to prove that a legally sufficient overt act in furtherance of the ongoing conspiracy charged in the indictment was committed on or after December 15, 2000.

### III. DISCUSSION

**A. Overt Acts**

"To constitute an overt act for purposes of the statute of limitations the act must involve some affirmative conduct or deliberate omission on the part of [the coconspirators]." United States v. Ben Zvi, 242 F.3d 89, 97 (2d Cir. 2001).

Mr. Michael Glick, an attorney for WebMD Corporation, testified about interviews he conducted with Mr. Kang and Mr. Sessions in 2003. In late 2002, Mr. Glick became involved in an internal investigation related to kickbacks in connection with the Medical Manager acquisition program. (Trial Tr. vol. 21, 4429-30, February 27, 2010.) This kickback scheme was the one orchestrated by Bobby Davids, the government's star witness. As part of the investigation, WebMD investigators, including Mr. Glick, interviewed former

officers and employees of Medical Manager.[12]  (Id. at 4429.)

In July 2003, Mr. Glick interviewed Mr. Sessions.[13]  One of the topics Mr. Glick inquired about was an acquisition deal involving a company called Raven.  Mr. Glick was interested in the Raven acquisition because this transaction was unwound within a few months of acquisition, the sellers received the company back, and Medical Manager allowed them to keep the purchase price.  (Id. at 4431.)  Mr. Sessions informed Mr. Glick that Mr. Kang was primarily involved with this transaction.  (Id.)  Mr. Sessions explained to Mr. Glick that Synetic agreed to purchase Raven, but "between the signing and closing [of the Synetic merger] . . . the expenses associated with Raven . . . outweighed the benefit."[14]  (Id. at 4431-32.)  According to Mr. Sessions, in consolidating Medical Manager and Synetic, "it made sense to get rid of those expenses."[15]  (Id. at 4432.)

Mr. Glick also testified that Mr. Sessions voluntarily and openly discussed the

---

[12]The focus of the investigation at the time of Mr. Sessions' interview was on Bobby Davids' kickback scheme, not on any accounting improprieties.  (Trial Tr. vol. 21, 4429, February 17, 2010.)  However, by the time Mr. Kang was interviewed, Mr. Glick was concerned with the kickback scheme and allegations of accounting improprieties.  On direct examination, the government elicited testimony to make it clear to the jury that there was no evidence that Mr. Kang or Mr. Sessions knew about or participated in any way with Bobby Davids' kickback scheme.  (Id.)

[13]At the time of the interview, Mr. Sessions was within a day or two of retirement from WebMD.  (Id. at 4445-46.)

[14]The expenses referenced by Mr. Sessions were employment contracts.  (Trial Tr. vol. 21, 4432, February 17, 2010.)  During his direct examination, Mr. Glick testified that, to his knowledge, he had not been able to find verification of  employment contracts.  (Id.)

[15]Synetic purchased Medical Manager in July 1999.  (Trial Tr. vol. 20, 4173, February 16, 2010.)  In September 2000, WebMD purchased the Synetic/Medical Manager corporation.  Thus, as of July 1999, defendants assumed a secondary role in the management of Medical Manager/Synetic/WebMD.

matters on which he was being asked. (Id. at 4446.) Mr. Glick was not aware of Mr. Sessions not telling the truth or attempting to conceal anything. (Id.) When asked by defense counsel about the Raven transaction and the employment contracts, Mr. Glick could not recall whether he had in fact seen the deal sheet from that transaction, which referenced employment contracts with two principals of Raven, Don Cook and Mark Brewer. (Id. at 4447-50.) As noted by defense counsel and Mr. Glick, at the time of these interviews, the Raven transaction had occurred four years earlier. Mr. Glick ultimately concluded that Mr. Sessions had a "mis-recollection" of the Raven transaction and formed no other conclusion regarding Mr. Sessions and that particular transaction. (Id. at 4448.) Mr. Glick testified that he "found no evidence in talking to John that he was not, that he was concealing the truth, and not telling the truth, I think I, if so from that standpoint, and I found no evidence that – I found no evidence that he perpetrated a fraud." (Id. at 4451.)

Mr. Glick testified that he interviewed Mr. Kang in late August 2003. (Id. at 4432-33.) Because he no longer worked for WebMD, Mr. Kang could not be compelled to participate, but he voluntarily appeared for the interview. (Id. at 4451.) Mr. Kang agreed to answer any questions concerning any matters, and he did not cut the interview short. (Id.) Mr. Kang answered all questions asked of him and never refused to answer a question. (Id. at 4452.)

During the interview, Mr. Kang informed Mr. Glick that Bobby Davids came up with the idea for "the simultaneous sale of software along with the acquisition of a company." (Id. at 4433.) According to Mr. Glick's testimony, Mr. Kang did not really have any recollection of the Raven transaction. (Id. at 4434.) Mr. Glick testified that during the

investigation, his focus was on understanding why the Raven deal was unraveled, and he did not look at the business reasons for this acquisition with respect to the Synetic merger. (Id. at 4454-55.)

According to Mr. Glick, Mr. Kang was questioned in regard "to the use of improper accounting to create artificial deferred revenue on the books of the companies that Medical Manager was acquiring." (Id. at 4438.) Mr. Kang stated that he did not know of any such accounting improprieties. (Id.) Mr. Kang represented to Mr. Glick that the accounting books of the acquired companies were proper and accurate.[16] (Id. at 4438-39.) Additionally, the notes from that interview reflect that the extent of Mr. Kang's memory was that there were a couple of dealers who became billing services, and that Medical Manager sold them licenses. (Id. at 4440-41.) Mr. Glick testified that Mr. Kang informed him that he did not believe any accounting improprieties had taken place, "that he believed that it was that the outside accountants were involved, and that he relied on them and believed that it was done appropriately."[17] (Id. at 4441-42.) Mr. Kang also maintained that the certification he signed during restatement weekend was accurate and that he was not aware of other transactions that needed restatement. (Id. at 4443.) Mr. Glick testified that the company never concluded that it needed to take any legal action against Mr. Kang.[18] (Id. at 4457.)

---

[16]There is no evidence in the record as to Mr. Kang's background or expertise in accounting matters.

[17]Mr. Kang's answers to Mr. Glick's questions are eerily reminiscent of the factual statement Mr. Singer filed along with his Deferred Prosecution Agreement.

[18]In fact, to the court's knowledge, WebMD never took legal action against any defendant named in the Second Superseding Indictment. The only legal action taken by WebMD was a suit against Bobby Davids to recover the funds he stole from Medical Manager/Synetic/WebMD. It was this lawsuit that provided the incentive for Mr. Davids

At the outset, the court notes that it questions whether the "acts" at issue constitute overt acts.[19]  At bottom, overt acts 166 and 168 involve nothing more than defendants Sessions and Kang, respectively, not volunteering that they conspired to commit accounting fraud, and allegedly stating that they may have engaged in business activity to increase productivity and profits or sales at Medical Manager.  Overt act 166 does not even allege that a false statement was made; rather, it asserts that Mr. Sessions "concealed the nature of the accounting fraud."  (Indict. ¶ 166.)  In other words, the overt acts they are alleged to have committed are their failure to immediately and voluntarily confess to Mr. Glick that they participated in an accounting fraud conspiracy.[20]

_____

to bare his soul to the FBI.  Moreover, even after the lengthy internal and external investigations, WebMD has never restated any other acquisition or accounting entry related to Medical Manager and/or Synetic.  See WebMD Health Corp., Annual Report (Form 10-K), at F-30 (March 2, 2010).

[19]Defendants do not concede that these were in fact overt acts.  Rather, they maintain that it is unnecessary to decide whether they are overt acts because the statute of limitations precludes consideration of them as such.  The court agrees with defense counsel that even if one assumes that the allegations in the indictment are true and that defendants outright lied, as opposed to being unable to recall specific details, defendants are still entitled to have their Rule 29 motion granted.

[20]Additionally, the overt acts are entirely consistent with the defense's position throughout this case.  Of course, overt acts may be completely innocent in nature.  However, the accounting fraud Mr. Sessions allegedly concealed is "specifically that certain Dealer acquisitions were structured with the specific intent of securing the financial results necessary to make quarterly revenue and earnings targets."  (Indict. ¶ 166.)  Paragraph 166 of the indictment appropriately highlights a fundamental problem with the government's case.  Often conspiracy cases involve conduct that has no legal component.  Unlike a conspiracy involving drugs or guns, this alleged conspiracy involved an extremely successful, legitimate business that played a significant role in revolutionizing the practice of medicine during the 1990s.  See, e.g., (Trial Tr. vol. 11, 2341-43, 2346-47, 2351-53, February 2, 2010; Trial Tr. vol. 17, 3649-53, February 10, 2010; Trial Tr. vol. 18, 3929-30, February 11, 2010.)  Therefore, all activity could not credibly be attributed to a criminal enterprise.  At trial, there was very little attempt to distinguish between the wholly legitimate and the allegedly illegitimate business activities of the company or any of the defendants by

13

Considering the evidence in the light most favorable to the government, the court will assume *arguendo* that the allegations in the indictment are true and that the Glick interviews with defendants Kang and Sessions constitute overt acts. This, however, does not end the inquiry. The court next must determine whether these "overt acts" were made in furtherance of the original conspiracy. For the reasons set forth below, the court concludes they were not.

## B. Completion of Conspiracy

Over a half century ago, the Supreme Court repeatedly addressed the issue of the duration of a conspiracy and expressed concern over the point at which a conspiracy legally ends. See Krulewitch v. United States, 336 U.S. 440 (1949); United States v. Lutwak, 344 U.S. 604 (1953); Grunewald v. United States, 353 U.S. 391 (1957). These cases make clear that although a conspiracy is a continuing offense, conspiracies are not immortal.

In Krulewitch, the Supreme Court addressed whether statements made by an alleged coconspirator could be admitted as non-hearsay statements. 336 U.S. 440. The Court clearly explained that once the central aims of the alleged conspiracy have been attained, the conspiracy ends. Id. According to the Court, "[t]his hearsay declaration, attributed to a coconspirator, was not made pursuant to and in furtherance of objectives of the conspiracy

_____

pointing out why acquisition X was a legitimate deal whereas acquisition Y was illegitimate. The trial involved only thirty-five acquisitions throughout the relevant time period, wherein Medical Manager engaged in hundreds of other dealer acquisitions during the same period. Returning to the language in Paragraphs 166-169, as officers of Medical Manager, Mr. Kang and Mr. Sessions had a duty to act in the best interests of the shareholders of Medical Manager, something that in a capitalist society means legitimately maximizing the financial results for a corporation and structuring deals to make revenue and earnings projections. That being said, the trial jury in this matter had little problem accepting the government's theory of this case and convicted defendants relatively quickly.

charged in the indictment, because if made, it was after those objectives had failed or had been achieved." Id. at 442. The government argued that although the chief objective had ended, the statement should be admitted as a statement "in furtherance of a continuing subsidiary objective of the conspiracy." Id. at 443. The Court characterized the government's argument as follows:

> Conspirators about to commit crimes always expressly or implicitly agree to collaborate with each other to conceal facts in order to prevent detection, conviction and punishment. Thus the argument is that even after the central criminal objectives of a conspiracy have succeeded or failed, an implicit subsidiary phase of the conspiracy always survives, the phase which has concealment as its sole objective.

Id.. The Court declined to hold admissible a "declaration made in furtherance of an alleged implied but uncharged conspiracy aimed at preventing detection and punishment." Id. at 444. The Court recognized that "[n]o federal court case cited by the Government suggests so hospitable a reception to the use of hearsay evidence to convict in conspiracy cases." Id. The Court was "not persuaded to adopt the Government's implicit conspiracy theory which in all criminal conspiracy cases would create automatically a further breach of the general rule against the admission of hearsay evidence." Id.

In Lutwak, the Court considered when the conspiracy ended in order to determine whether acts and declarations were erroneously admitted against all defendants, without properly limiting admission to a particular defendant. 344 U.S. 604. "The Government contend[ed] that a part of the conspiracy was an agreement among the conspirators to conceal their fraud by any means, and so it was alleged in the indictment." Id. at 616. The Court concluded there was "no statement in the indictment of a single overt act of concealment that was committed after December 5, 1947, and no substantial evidence of

any." Id. According to the Court, "[t]here [was] no evidence in the record to establish as part of the conspiracy that the conspirators agreed to conceal the conspiracy by doing what was necessary and expedient to prevent its disclosure." Id. The Court recognized that a defendant had made one statement to a witness that suggested an intent to conceal the conspiracy. Id. However, the Court determined: "This is not evidence that the conspiracy included the further agreement to conceal. It is in the nature of an afterthought by the conspirator for the purpose of covering up." Id.

The Court ultimately held that "[t]here can be no furtherance of a conspiracy that has ended." Id. at 617-18. Although "concealment was alleged in the indictment as part of the conspiracy," the Court concluded that it had not been proven. Id. Stated simply, because the conspiracy had ended, the acts and declarations of a single defendant could not be admitted against all defendants. Id. at 618.

In Grunewald,[21] the Supreme Court reiterated its earlier warning that the Court "will view with disfavor attempts to broaden the already pervasive and wide-sweeping nets of conspiracy prosecutions." 353 U.S. at 404. The Court rejected the "proposition that the duration of a conspiracy can be indefinitely lengthened merely because the conspiracy is kept a secret, and merely because the conspirators take steps to bury their traces, in order to avoid detection and punishment after the central criminal purpose has been accomplished."[22]

---

[21]The court finds that Grunewald dictates the outcome of this case. Indeed, the court believes that it simply could have changed the caption in Grunewald and granted defendants' Rule 29 motion.

[22]In its initial response to defendants' Rule 29 motion, the government suggested that Grunewald concerned "generalized allegations of concealment for the broad purpose of avoiding detection and prosecution by law enforcement officials." (Dkt. 964.) While the

16

Id. at 405.

The indictment in Grunewald charged a violation of Title 18, United States Code, Section 371 as the first count.  Id. at 393.  The indictment alleged a conspiracy "to defraud the United States in the exercise of its governmental functions of administering the internal revenue laws and of detection and prosecuting violations of the internal revenue laws free from bribery, unlawful impairment, obstruction, improper influence, dishonesty, fraud and corruption."  Id. at 394.  The government also alleged "that a part of the conspiracy was an agreement to conceal the acts of the conspirators."  Id.  The indictment charged overt acts within the applicable statute of limitations.  Id.  The Supreme Court identified some of the acts of concealment as: 1) attempts by coconspirators to have government reports "doctored"; 2) the conspirators "took steps to hide their traces" after they felt threatened by a congressional investigation; 3) one conspirator caused records linking him to another conspirator to disappear; 4) "taxpayers were repeatedly warned to keep quiet"; 5) after the taxpayers and conspirators were called before a grand jury, one of the conspirators "attempted to induce the taxpayers not to reveal the conspiracy"; and 6) one of the conspirators "asked his secretary not to talk to the grand jury."  Id. at 395-96.

The first issue before the Court was whether the applicable statute of limitations

_____

trial judge's instructions referenced the indictment, which apparently referred to "any governmental body, executive, legislative and judicial . . . .," the language of the opinion does not suggest that the Court limited its holding to law enforcement officials.  Although there were attempts to persuade people not to talk to the grand jury, the record also reflected that steps were taken to hide the conspiracy from an outside law firm.  Grunewald, 353 U.S. at 403.  Limiting Grunewald's holding to concealing criminal activity solely from law enforcement is illogical.

barred prosecution of the conspiracy charged in Count One.[23] Id. at 396. According to the Court, "[i]t was therefore incumbent on the Government to prove that the conspiracy, as contemplated in the agreement as finally formulated, was still in existence on October 25, 1951, and that at least one overt act in furtherance of the conspiracy was performed after that date." Id. Where a conspiracy requires proof of an overt act, "it must be shown both that the conspiracy still subsisted within [the statute of limitations period], and that at least one overt act in furtherance of the conspiratorial agreement was performed within that period." Id. at 397. Thus, the Court concluded that:

> the crucial question in determining whether the statute of limitations has run is the scope of the conspiratorial agreement, for it is that which determines both the duration of the conspiracy, and whether the act relied on as an overt act may properly be regarded as in furtherance of the conspiracy.

Id.

The government made two principal arguments to the Court: 1) that even if the main conspiratorial objective had been attained, "the conspiracy also included as a subsidiary element an agreement to conceal the conspiracy," id. at 398; and 2) that the central aim of the conspiracy was not only a "no prosecution ruling," but also absolute immunity such that the objectives of the conspiracy were not attained until the statute of limitations ran. Id. Under the second theory asserted by the government, "the acts of concealment[] may be regarded as, at least in part, in furtherance of the objective of the conspirators," and, therefore, the indictment was timely. Id. at 399.

The Court concluded that the government's first argument was foreclosed by

---

[23]It is worth reiterating that the issue before the Supreme Court in Grunewald is identical to the matter before this court. Id. at 396.

Krulewitch and Lutwak.  Id.  After extensively quoting Krulewitch and noting that Lutwak reaffirmed Krulewitch, the Court rejected the distinction argued by the government that those cases involved an attempt to imply a conspiracy to conceal, whereas in Grunewald, an actual agreement to "conceal was charged and proved to be an express part of the initial conspiracy."  Id. at 401.  The Court concluded that the cases could not "be distinguished on such a basis."  Id.

> Rather, the Court clarified that:

> [T]he crucial teaching of Krulewitch and Lutwak is that after the central criminal purposes of a conspiracy have been attained, a subsidiary conspiracy to conceal may not be implied from circumstantial evidence showing merely that the conspiracy was kept a secret and that the conspirators took care to cover up their crime in order to escape detection and punishment.  As was there stated, allowing such a conspiracy to conceal to be inferred or implied from mere overt acts of concealment would result in a great widening of the scope of conspiracy prosecutions since it would extend the life of the conspiracy indefinitely.  Acts of covering up, even though done in the context of a mutually understood need for secrecy, cannot themselves constitute proof that concealment of the crime after its commission was part of the initial agreement among conspirators.  For every conspiracy is by its very nature secret; a case can hardly be supposed where men concert together for crime and advertise their purpose to the world.  And again, every conspiracy will inevitably be followed by actions taken to cover the conspirators' traces.  Sanctioning the Government's theory would for all practical purposes wipe out the statute of limitations in conspiracy cases, as well as extend indefinitely the time within which hearsay declarations will bind conspirators.

Grunewald, 353 U.S. at 401-02.  The Court considered the government's argument as to the difference between an "actual" and "implied" conspiracy to be "no more than a verbal tour de force."  Id. at 402.

The Court examined the evidence from which the government argued an actual agreement to conceal was present.  Id.  According to the Court, the record reflected the

following evidence from which the government asked the Court to find an actual agreement to conceal: 1) "from the beginning the conspirators insisted on secrecy . . . the identities of [two coconspirators] were sedulously kept from taxpayers"; 2) "careful steps were taken to hide the conspiracy from an independent law firm";[24] 3) "the taxpayers were told to make sure that their books did not reflect the large cash payments made to Grunewald"; 4) "after the 'no prosecution' rulings were obtained . . . facts sho[w] that this secrecy was still maintained" including "a deliberate attempt . . . to make the above-mentioned independent law firm believe that it was its (quite legitimate) efforts which produced the successful ruling"; 5) one conspirator destroyed certain records showing use of a hotel room; 6) a conspirator's "accountant was persuaded to lie to the grand jury concerning a check made out to an associate of the conspirators"; 7) one conspirator attempted to convince his assistant to refrain from speaking to the grand jury; and 8) "the taxpayers were repeatedly told by [a coconspirator] and his associates to be quiet." Id. at 403. After considering all of this evidence, the Court

> [found] in all of this nothing more than what was involved in Krulewitch, that is, (1) a criminal conspiracy which is carried out in secrecy; (2) a continuation of the secrecy after the accomplishment of the crime; and (3) desperate attempts to cover up after the crime begins to come to light; and so we cannot agree that this case does not fall within the ban of those prior opinions.

Id.

The Court, however, acknowledged that acts of concealment could theoretically further a conspiracy, but still declined to consider them acts in furtherance of a conspiracy

---

[24]These acts are not unlike the alleged overt acts in Paragraphs 166-169, which consist of hiding the conspiracy from Mr. Glick.

once the main conspiratorial objectives had been achieved. <u>Id.</u> at 405. The Court stated that "a vital distinction must be made between acts of concealment done in furtherance of the main criminal objectives of the conspiracy, and acts of concealment done after these central objectives have been attained, <u>for purposes only of covering up after the crime</u>." <u>Id.</u> (emphasis added).

Here, the government maintains that there was an express original agreement to conceal. Additionally, regardless of whether there was an express original agreement to conceal, the government contends that the concealment and personal enrichment objectives of the conspiracy had not been attained and, therefore, the conspiracy was ongoing in 2003. The court will address each of the government's arguments in turn.

### 1. Express Original Agreement to Conceal

In <u>Grunewald</u>, the Court explained that a conspiracy to conceal "will be present in virtually every conspiracy case, that is, secrecy plus overt acts of concealment." 353 U.S. at 404. The Court recognized that "[t]here [was] not a shred of direct evidence in this record to show anything like an express original agreement among the conspirators to continue to act in concert in order to cover up, for their own self-protection, traces of the crime after its commission." <u>Id.</u> In other words, <u>Grunewald</u> requires several things in order to prove defendants entered into this conspiracy. <u>Id.</u> First, there must be direct evidence of the alleged conspiracy in the record. <u>Id.</u> Second, the agreement must be express. <u>Id.</u> Third, it must be original. <u>Id.</u> Finally, it "must be to act in concert in order to cover up, for their own self-protection, traces of the crime <u>after</u> its commission." <u>Id.</u> (emphasis added).

Here, according to the government, defendants entered into an express original

agreement to conceal the crime because they were still concealing their alleged accounting fraud in 2003.[25] Instances of concealment during a conspiracy do not equal an express original agreement to conceal the crime after it has been completed. There is absolutely no direct evidence in the record to support such a conspiracy to conceal.

The government suggests that defendants' actions during "restatement weekend," which occurred in August 1999, somehow proves that there was an express original agreement beginning in 1997. The obvious flaw in this reasoning is that restatement weekend happened two years after the alleged conspiratorial agreement commenced.[26] The Supreme Court requires this agreement to be "original."[27] Thus, the agreement to conceal must have been formed at the beginning of the charged conspiracy. The government cannot transmute evidence of events that happened to conceal an ongoing conspiracy into direct

---

[25]The court acknowledges that this sentence simply means that there was an alleged conspiracy to begin with and that the alleged conspirators did not advertise their criminal conspiracy. However, since the government takes the position that this actually means something different in this case, the court will do its best to address these arguments.

[26]Moreover, "restatement weekend" was not only about concealment. In fact, several transactions were restated, and these restatements did not occur without disclosing accounting errors. Although there is evidence in the record that the alleged conspirators did not want to disclose additional transactions, at least some of the transactions that could have been considered improper were identified and corrected. Ms. Caroline Bembry testified that the alleged conspirators tried to present excuses for acquisition prices to Medical Manager's outside accounting firm, but when PriceWaterhouse Coopers ("PWC") had questions about the transactions, PWC made Medical Manager restate the transactions. (Trial Tr. vol. 17, 3697-98, February 10, 2010.)

[27]The court need not look any further than the Bible to understand the word "original." Romans 5:12-21; 1 Corinthians 15:22. However, to leave no stone unturned, the Oxford English Dictionary defines "original" as "1. a. [t]hat is the origin or source of something; from which something springs, proceeds, or is derived; primary . . . 2. a. belonging to the beginning or earliest stage of something; existing at or from the first; earliest, first in time." Oxford English Dictionary Online (last visited May 3, 2010).

evidence of an original agreement to conceal the conspiracy after its completion. Moreover, to meet the requirement that the concealment conspiracy be aimed at covering up the crime after it is completed, accepting the government's theory would necessarily mean that it believes the original conspiracy ended at or before restatement weekend.[28] The government seems to take the position that because it does not like the law, it must be ignored. This court is not able to erase, at its leisure, the last three words of the sentence in <u>Grunewald</u> that indicate that one original purpose of the conspiracy to conceal must be to cover up the crime <u>after</u> commission. <u>Id.</u> at 404.

Unless the court has missed something, not only is there no direct evidence of an express, original agreement to conceal, there was no direct evidence of an express, original agreement to do anything. Mr. Davids testified that he never had any kind of an agreement to do anything wrong at Medical Manager with either defendant. (Trial Tr. vol. 8, 1754, January 28, 2010.) Mr. Kevin Kennedy, another government witness and participant in Davids' kickback scheme, also testified that he did not have any agreement to do anything wrong with Mr. Kang.[29] (Trial Tr. vol. 15, 3104, February 8, 2010.) Moreover, Mr. Maxie Juzang, a defendant indicted in the Second Superseding Indictment,[30] testified that he never

---

[28]At the hearing, the government suggested that restatement weekend could also be evidence of the formation of a second express, "original" agreement to conceal the crime after its commission. Implicit in this theory would be that the original conspiracy had already ended by restatement weekend in August 1999. The government also maintains that the conspiracy was ongoing until 2003. These theories are mutually exclusive, either the original conspiracy was ongoing or it was not in August 1999.

[29]Mr. Kennedy testified that as to the PCN transaction only, Mr. Sessions' involvement was "understood." (Trial Tr. vol. 15, 3104, February 8, 2010.)

[30]The court granted the government's motion to dismiss the indictment against Mr. Juzang on April 2, 2007.

conspired with Mr. Sessions, he never committed a crime, and Mr. Sessions never told him to do anything improper, illegal, or wrong.[31] (Trial Tr. vol. 13, 2658-2670, February 4, 2010.) This testimony, at a minimum, suggests that Mr. Juzang believes he never entered into an express agreement to do anything unlawful with these defendants or anyone else. Further, Mr. Juzang's testimony that there was no agreement means that the government necessarily would have to rely on circumstantial evidence to support any argument that there was an express agreement to conceal—reliance on which is clearly prohibited by Grunewald. See Grunewald, 353 U.S. at 404.

Even taking the evidence in the light most favorable to the prosecution, the government's case barely supports an implied agreement to commit accounting fraud. The "substantial evidence" which allowed the government to survive defendants' alternative Rule 29 motion was the testimony of Ms. Caroline Bembry Cronin,[32] an unindicted coconspirator,[33] and a second paramour of Bobby Davids. She testified that as part of the Medical Manager acquisition program she participated in methods to artificially inflate income and revenue. (Trial Tr. vol. 17, 3677, February 10, 2010.) Ms. Bembry testified that everyone "on the team" at Medical Manager, including Bobby Davids, Charlie Hutchinson,

[31]In addition to the oath all witnesses take, the agreements entered into by Messrs. Kennedy and Juzang and the government required them to tell the truth. Because they were the government's witnesses, presumably, it does not take issue with the truthfulness of their trial testimony.

[32]Ms. Cronin was formerly Ms. Caroline Bembry. Because she is referred to throughout this litigation as Ms. Bembry, the court will continue to do so for purposes of clarity.

[33]Ms. Bembry entered into an agreement with the government that she would not be prosecuted in exchange for her truthful testimony at trial. (Trial Tr. vol. 17, 3705-06, February 10, 2010.)

John Kang, John Sessions, Lee Robbins, Kevin Kennedy, and Frank Krieger knew[34] they were "basically" committing fraud by concealing information from auditors and manipulating balance sheets for the acquired companies. (Id. at 3674-82.) She testified that "it was an understanding of this is what we need to make the numbers, to make it happen. It was 'a wink and a nod' type of agreement." (Id. at 3682-83; Trial Tr. vol. 18, 3983, February 11, 2010.) She testified that in the beginning there were not large transactions, so "you kind of started to believe the excuses that you make up, um, and you 'drink the Kool-Aid.'" (Id. at 3683.) Ms. Bembry's testimony edges the government's case over the Rule 29 sufficiency of the evidence hurdle. While Ms. Bembry's testimony suggests an amorphous implied agreement to accomplish an unlawful objective, it certainly in no way indicates an express agreement to commit accounting fraud, especially considering that she was not even sure in the beginning that the transactions were not legitimate. (Trial Tr. vol. 18, 3919-20, 3932, 3952-55, 3962-73, February 11, 2010.)

Additionally, the government never presented any theory that defendants entered into an express, original agreement to conceal the crime after its commission to the jury.[35] The indictment makes no mention of an express, original agreement to conceal; rather, concealment is included as a purpose of the primary conspiracy. Again, the government did

---

[34]Ms. Bembry testified that Bobby Davids was her point of reference for the assertion that everyone "knew" about the allegedly improper accounting practices at Medical Manager and that Mr. Davids was her primary contact for the acquisition accounting. (Trial Tr. vol. 18, 3893, 3933-41, February 11, 2010.)

[35]Presumably, the government would not have so strenuously objected to a proposed multiple conspiracy charge if, in fact, it was arguing that there was the original charged conspiracy that formed in or around 1997, and then a second express agreement to conceal that was formed in 1999.

not take such a position prior to defendants' Rule 29 motion.[36]  In its first response, the government stated that the indictment "specifically alleged a continuing conspiracy to conceal the accounting fraud that lasted until the summer of 2003 with the advent of an internal investigation that resulted in the interviews of both defendants." (Dkt. 964 at 1.) According to the government, "[t]he overt acts related directly to one of the conspiracy's central purposes, keeping its fraudulent activities a secret." <u>Id.</u> at 9. If "the concealment was merely a logical continuation and extension of the cover-up put into place during and before restatement weekend itself," (<u>id.</u> at 11), and all restatement weekend did was "preserve the status quo," (<u>id.</u> at 14), then it cannot simultaneously have been an express, original agreement to conceal the crime after its commission.  Because there is not a shred of evidence to suggest that defendants entered into this conspiracy with an express, <u>original</u> agreement to conceal the crime after its commission, this argument cannot succeed.

## 2. Scope of the Conspiracy

The government also contends that the scope of the conspiracy as charged encompasses the overt acts of concealment in furtherance of the conspiracy.  In other words, the conspiracy was ongoing when the overt acts were committed because they were in furtherance of the charged purposes to conceal the conspiracy and to obtain personal enrichment for Messrs. Kang and Sessions.

The government is correct that "[t]o determine the scope of the alleged conspiratorial agreement, the court is bound by the language of the indictment."  <u>United States v. Hitt</u>, 49

---

[36]Arguably, the government never expressly made this argument until the hearing on April 13, 2010.  Because the court did not understand this to be a position the government was taking, there is absolutely no way the jury could have considered it.

F.3d 1010, 1015 (D.C. Cir. 2001). "Adherence to the language of the indictment is essential because the Fifth Amendment requires that criminal prosecutions be limited to the unique allegations of the indictments returned by the grand jury." Id. at 1016. The indictment establishes the outer limits of the scope of the conspiracy because it serves as notice to the defendant of the nature of the accusation. Id. at 1015-16. However, this court is not aware of any rule of law whereby the indictment controls the scope of the conspiracy when the evidence at trial does not support the same. In other words, the indictment establishes a ceiling not a floor.[37]

In a more recent case, the D.C. Circuit easily rejected the government's position that it is only the language of the indictment that controls the scope of the conspiracy. United States v. Turner, 548 F.3d 1094, 1097 (D.C. Cir. 2008). In Turner, as in the case before this court, the government maintained that because the language in the indictment expressly alleged that "one object of the conspiracy was 'to conceal the conspiracy itself and the acts committed in furtherance thereof,'" the conspiracy continued into the relevant time period.[38] Id. at 1097. According to the D.C. Circuit, "[t]he government's idea is that 'the language

---

[37]The court recognizes that the language of the indictment would control for purposes of a motion to dismiss an indictment on statute of limitations grounds. There is no contention at this time that the indictment should have been dismissed on those grounds. Rather, the issue is whether there was sufficient proof at trial that the conspiracy was ongoing, and that an overt act was committed in furtherance of that conspiracy during the limitations period.

[38]The endpoint of the conspiracy was at issue in Turner because it was necessary to determine the applicable Sentencing Guidelines. Turner, 548 F.3d at 1096-97. The D.C. Circuit recognized that "when a conspiracy ends typically arises in cases in which the defendant raises a statute of limitations defense," but concluded that those cases were controlling regardless of the context. Id.

of the indictment is controlling.'" Id.  The court commented "[i]f this is supposed to mean that one need only look at the indictment to determine the duration of the conspiracy, the government is quite mistaken." Id.  After reviewing the holdings of the Lutwak and Grunewald, the court explained its earlier decision that the portion on which the government relied "simply st[rung] together citations and quotations from the cases.  It does not, indeed could not, disagree with Grunewald or Lutwak." Id. at 1097.  The D.C. Circuit concluded that regardless of the language of the indictment, the matter of when the conspiracy ended was "squarely within the Krulewitch-Lutwak-Grunewald pattern and [that] leads to the conclusion that the conspiracy did not continue after 2001." Id. at 1098.

This court recognizes that the indictment charged multiple purposes of the conspiracy.  The record is clear that the three main conspiratorial objectives were achieved well before the limitations period began to run on December 15, 2000.[39]  The first three purposes of the indictment center around the allegedly fraudulent accounting practices. (Indict. ¶ 26 (a)-(c).)  These objectives are clearly the heart of the alleged conspiracy.  By the time Medical Manager/Synetic ultimately merged with WebMD, the alleged objectives necessarily would have been attained.[40]  Absent those purposes, the conspiracy would consist of an agreement to conceal and to obtain personal enrichment but without any other unlawful conspiratorial objectives.

---

[39]Presumably, the government does not take issue with this conclusion, as it has not suggested that these three objectives were ongoing when the statute began to run.

[40]Arguably, this happened in 1999 because the Synetic merger and attendant leadership of the "New Jersey people" would have prevented the alleged accounting fraud conspiracy from continuing.

Taking the evidence in the light most favorable to the government, the court finds that the conspiracy charged in Count One of the Second Superseding Indictment ended no later than September 15, 2000, the date of the WebMD merger, because there was no evidence at trial of any acts related to the alleged conspiracy after that date. Additionally, Bobby Davids testified that the Benchmark transaction was the only fraudulent transaction after the Synetic merger, and that was done to mask his kickback on this transaction, although it still accomplished the dealer acquisition objectives.[41] (Trial Tr. vol. 5, 1176, January 25, 2010.) He testified that "without question at that time the making of the numbers were not nearly as important to the company, given the stock market status at the time." (Id.) The Benchmark transaction occurred in the first quarter of 2000, six months before the WebMD merger occurred. (Id.) Even assuming that a conspiracy existed prior to September 2000, the court is not willing to stretch the limits of this conspiracy beyond that date. No rational trier of fact could conclude that post-September 2000 acts of concealment were done in furtherance of the original criminal objectives. The overt acts found by the jury are meaningless because they are not within the scope of the original conspiratorial agreement. See Grunewald, 353 U.S. at 415.

Although the court finds that the conspiracy ended on September 15, 2000, at the latest, and that the government has not proven an express, original agreement to conceal, the court will explain why the government's remaining argument—that the conspiracy was

---

[41]Notably, his testimony on this transaction lacked any suggestion that the dealer acquisition objectives were illegitimate. Bobby Davids plea agreement also required him to testify truthfully and since he was the government's key witness, it cannot credibly take issue with the truthfulness of his trial testimony.

ongoing because two of the alleged conspiratorial objectives had not been attained—must fail.

### a. Concealment Objective of the Conspiracy

"If [a conspiracy to conceal] were enough to keep the conspiracy alive after accomplishment of its central objects, the statute of limitations would never run until the conspirators' death, conviction, or confession." <u>Turner</u>, 548 F.3d at 1987.

According to the government, "keeping its fraudulent activities a secret" was a central purpose of the conspiracy and charged in the indictment. (Dkt. 964 at 9.) The government maintains that the 2003 concealment from WebMD lawyers was tied to the ultimate purpose of personal enrichment as alleged in Paragraph 26 of the Second Superseding Indictment. (<u>Id.</u> at 10.) The government argues that the acts of concealment in this case are more akin to those the Supreme Court suggested in <u>Grunewald</u> may be valid since acts of concealment were necessary to complete the crime. However, this analogy misses the mark. In <u>Grunewald</u>, there was an identifiable endpoint to the conspiracy that informed the entire analysis, i.e., when the statute of limitations for tax fraud ran such that the income would be permanently protected. By contrast, in this case according to the government's theory, there would never be an end to this conspiracy absent withdrawal, a confession by one, or death of all alleged coconspirators. Thus, the statute itself would never begin to run. The Supreme Court has clearly rejected such a limitless approach to conspiracy prosecutions.

Moreover, it defies common sense to suggest that concealment is not fundamental in every conspiracy. The court rejects the government's contention that somehow the

concealment alleged in this case is different or unique, rather than part and parcel of any conspiracy to commit accounting fraud.[42] The government also argued in its initial response to defendants' Rule 29 motion that "[b]ased on the evidence adduced at trial, it is clear that this concealment is directly tied to the ultimate and final purpose of the conspiracy: 'to personally enrich defendants.'" (Dkt. 964 at 10.) Essentially, attempting to distinguish the purpose of concealment is merely recasting the other purposes of the conspiracy in the vain hope of saving the prosecution of this case.

In its response to the court's request for supplemental briefing, the government cited many alleged overt acts that were aimed at concealment or were acts of concealment. (Dkt. 1001 at 4-10.) With the exception of the two interviews with Mr. Glick that occurred in 2003, and are the basis of this order, not a single one of these overt acts of concealment occurred within the statute of limitations period.

The acts at issue in the present case much more closely resemble the kidnappers who try to escape detection after they have abandoned the victim, rather than the kidnappers who commit acts of concealment while waiting for the ransom. See Grunewald, 353 U.S. at 405. The government's argument that there was an agreement to conceal is "one of words rather than of substance." Grunewald, 353 U.S. at 403. There is a distinction between a conspiracy that has concealment as one purpose and a conspiracy where the concealment is

---

[42]The court recognizes that implicit in any financial fraud conspiracy will be false statements and concealment. However, because this is true of all financial fraud cases does not mean Grunewald is inapplicable, and that alleged "acts of concealment" after the main conspiratorial objectives have been attained are sufficient to extend the life of the original conspiracy. The government cannot just re-characterize a conspiracy to commit mail, wire, and securities fraud as a conspiracy to conceal—they are one and the same.

part of an express original agreement. As the Supreme Court has made clear, the former is a purpose of every conspiracy. Simply because the government charges concealment as a purpose, and continues to repeat that there was a conspiracy to conceal, does not make it legally sufficient. In this case, as in <u>Grunewald</u>, "the acts of covering up can by themselves indicate nothing more than that the conspirators do not wish to be apprehended—a concomitant, certainly, of every crime since Cain attempted to conceal the murder of Abel from the Lord." <u>Grunewald</u>, 353 U.S. at 406.

If the Supreme Court rejected the acts of concealment in <u>Grunewald</u>, there is no chance that this court can find the Glick interviews to be overt acts in furtherance of this conspiracy. In <u>Grunewald</u>, the record reflected much more affirmative action. <u>Id.</u> at 402-03. Here, other than restatement weekend, two years into the alleged conspiracy, there is no evidence that any conspirator insisted on secrecy. While Davids testified that he covered up evidence of his manipulation of accounting records and actively misled Medical Manager's outside accounting firm, he testified that he never instructed anyone to hide anything from the outside accounting firm. (Trial Tr. vol. 8, 1747, January 28, 2010.) According to Davids, neither Mr. Kang nor Mr. Sessions, nor any other alleged co-conspirator, ever told him to hide anything from the outside accountants. (<u>Id.</u>) In fact, another government witness, Jim Hanlon, a partner at PWC, testified that the auditors at PWC were never denied access to any information by Medical Manager. (Trial Tr. vol. 20, 4222, February 16, 2010.) He also testified that during the Synetic merger nothing was kept from Arthur Andersen, Synetic's oustide accounting firm, and no one from Medical Manager ever suggested that anything be hidden. (<u>Id.</u> at 4305.) Additionally, Medical Manager participated in reviews

with PWC that, at the time, were not required by law for public companies. (Id. at 4092-93.) In relation to this alleged conspiracy, there is no evidence that either defendant, or any other alleged coconspirator, ever destroyed or secreted any records, documents, computer files, or anything else for that matter. There is no evidence that they ever encouraged people outside the conspiracy to lie to any outside individuals. While Ms. Bembry testified that they gave PWC excuses, she did not testify that any non-conspirator was told to do so. (Trial Tr. vol. 17, 3678-79, 3697-3699, February 10, 2010.) Moreover, the alleged conduct referred to by Ms. Bembry occurred well before the limitations period began as she left the company several months after restatement weekend and well before the WebMD merger in September 2000. (Trial Tr. vol. 17, 3704, February 10, 2010; Trial Tr. vol. 18, 3839, February 11, 2010.)

Furthermore, there is no evidence that the alleged coconspirators attempted to coerce anyone outside the conspiracy to do anything improper. Mrs. Sandy Plumb, Mr. Singer's executive assistant, testified that she never heard anything in any of the executive meetings[43] she attended twice a week that she considered improper by either defendant. (Trial Tr. vol. 17, 3638-39, February 10, 2010.) The government concedes Mrs. Plumb was not part of the

---

[43]The parties fought tooth and nail over the admissibility of Mrs. Plumb's executive committee meeting notes. Although the notes may have reflected a perfectly legitimate business practice, the government alleged that they were the heartland of this conspiracy. Defendants were never the only participants on these calls. If these calls were so indicative of a criminal conspiracy, then one would assume all the other participants were just as culpable. There is no suggestion that Mrs. Plumb was part of the conspiracy and she was present for the overwhelming majority of these calls because Mr. Singer chaired these meetings. (Trial Tr. vol. 17, 3571, February 10, 2010.) Interestingly, Bobby Davids was rarely present at these meetings and Carolyn Bembry never attended any executive committee or forecasting meeting.

alleged conspiracy. She also testified that she never heard "Mr. Sessions or Mr. Kang direct anyone to participate in any misconduct." (Id.) Mrs. Plumb did not at the time of the calls, nor during her testimony, find it unusual that the executives discussed projections and budget forecasts during their meetings.[44] (Id. at 3649-51.) She also testified that she never heard anyone suggest hiding anything from outside accountants and lawyers. (Id. at 3653.) When asked by defense counsel, Mrs. Plumb reiterated that she never heard either defendant or anyone else "suggest any impropriety or direct anyone to do anything improper on any of those calls or in those meetings." (Id. at 3661.) Mrs. Plumb also testified that "there was a culture of doing the right thing at Medical Manager," and if an accounting or legal question arose, the company tried to get the best professional advice. (Id. at 3663-64.)

Concealment in and of itself cannot serve to extend the life of the conspiracy alleged by the government into the limitations period. Irrespective of any acts of concealment alleged or proven at trial that occurred during the alleged conspiracy to commit mail, wire, and securities fraud, other than silence, there was no conspiratorial activity beyond September 2000. In other words, "concealment was . . . [not] essential to the continuing vitality of the conspiracy," because no conspiracy existed to continue. United States v. Justus, 162 F.3d 1157, *6 (4th Cir. 1998) (Table). The interviews with Mr. Glick were not acts of concealment necessary to complete the original conspiracy alleged in the indictment.

---

[44]The court does not think it is unusual for corporate management to discuss earnings projections and budget forecasts. Mrs. Plumb testified that she considered it to be part of management's role in the business. (Trial Tr. vol. 17, 3649-50, February 10, 2010.) She also testified that she considered the management team to have worked hard to help the company grow. (Id. at 3660-61.) Mr. Hanlon testified that all companies try to meet investment community expectations, and earnings management is a vehicle companies use to meet those targets. (Trial Tr. vol. 20, 4104-05, February 16, 2010.)

While the conspiracy alleged may have involved concealment, concealment during an ongoing conspiracy does not convert the Glick interviews in 2003 into acts of concealment necessary for the completion of the crime. Thus, the government's contention that this purpose or the two interviews in 2003 is sufficient to defeat defendants' statute of limitations defense is without merit.

### b. Personal Enrichment Objective of the Conspiracy

The government's last argument is that because the purpose of obtaining personal enrichment had not yet been fully attained, and/or the enrichment received was still being protected, the life of the conspiracy was ongoing.

The government is correct that courts have recognized that a conspiracy may continue until receipt of the anticipated economic benefits. See United States v. Salmonese, 352 F.3d 608, 615 (2d Cir. 2003). The Second Circuit based this rule on the "well-established principles that (1) a conspiracy continues 'until its aim has been achieved, it has been abandoned, or otherwise terminated,' . . . and (2) absent withdrawal, a conspirator's 'participation in the conspiracy is presumed until the last overt act by any of the conspirators.'"[45] Id. The court rejected the defendant's argument because the indictments

_____

[45]The court does not dispute the government's point, or the Fourth or Second Circuits' holdings, that "[a] defendant's membership in a conspiracy is presumed to continue until he withdraws from the conspiracy by affirmative action." United States v. Barsanti, 943 F.2d 428 (4th Cir. 1991). While it is a true statement of the law, whether a coconspirator has withdrawn is an irrelevant question to this case. Clearly, whether a conspiracy's aims have been achieved, abandoned, or otherwise terminated is the first question that must be answered. The issue in this case is whether the entire conspiracy had ended, not whether the conspiracy was ongoing but with a particular defendant having raised withdrawal as a defense. Here, the entire conspiracy ended in September 2000. Accordingly, any argument that a defendant in this case did not affirmatively withdraw from an ongoing conspiracy is unavailing, and, again, foreclosed by the Supreme Court, which has

"specifically allege that the ultimate conspiratorial goal was the sale of fraudulently acquired and inflated securities and the receipt of substantial cash profits."  Id.  The indictment expressly alleged that "[a]s a result of this scheme, the defendants obtained illegal profits of not less than approximately $2.0 million."  Id.  The Second Circuit determined that sale of the stripped warrants "were hardly 'indefinite' in number or 'lengthy' in duration."  Id. at 616.  The court also recognized that the warrants were sold within ten weeks of the public offering because in order to receive the benefits of the conspiracy, the warrants had to be sold before their inflated market price collapsed.  Id.  The Second Circuit concluded:

> [B]ecause a "conspiracy continues so long as overt acts in furtherance of its purposes are done," . . . because receipt of anticipated profits is an overt act in furtherance of an economically-motivated conspiracy, . . . and because an overt act may be committed by "only a single one the conspirators," . . . we reject [defendant's] argument that, as a matter of law, a single conspirator's receipt of anticipated benefits within the limitations period cannot, by itself, establish an ongoing conspiracy."

Id. at 616-17 (internal citations omitted).

The court determined that "what establishes the receipt as an overt act is not whether the conspiracy's conduct can be labeled 'active' or 'passive,' but whether the receipt was knowing and intentional."  Id. at 618.  It cannot be an overt act in furtherance of the conspiracy for a conspirator to unwittingly receive criminal proceeds.  Id.  "The requisite knowledge and intent to possess such proceeds, not the means employed to take possessions, are the decisive factors in established a conspirator's 'affirmative' receipt of the proceeds, or at the least, his 'deliberate' failure to renounce them."  Id.

The government also relies on the Fourth Circuit's decision in United States v.

_____

expressly rejected the notion that a conspiracy can exist indefinitely.

Weaver, 966 F.2d 1446 (4th Cir. 1992) (Table). The Fourth Circuit upheld the district court's ruling that attempting to hide muddy shoes was an act of concealment in furtherance of an ongoing conspiracy because the conspiracy had not ended. Id. at *5-*6. The conspiracy had not ended because "[g]iven the nature of the armored car heist and the proceeds derived therefrom, which included jewelry and foreign currency, the district court might reasonably have concluded that the objects of the conspiracy were not attained until the booty was converted to United States currency and divided among the conspirators." Id. at *6.

The government's reliance on these two decisions is misplaced. Unlike in Salmonese, receipt of any ill-gotten gains is not the overt act with which this court is concerned. There is no evidence of any criminal proceeds that resulted from the alleged fraud.[46] Here, the indictment does not have receipt as an overt act.[47] It is not an accurate parallel for the government to argue that in this case it charged "obtaining personal enrichment" as a purpose, and that is sufficient under Salmonese because the Second Circuit allowed the (specifically charged) knowing and intentional receipt of criminal proceeds to constitute an overt act that continued the conspiracy. There was no evidence of actual

---

[46]Even if one assumes, and the court is not suggesting that it does, that defendants received any of the types of personal enrichment identified in Paragraph 26 of the Second Superseding Indictment, there is absolutely no evidence that any of it occurred after the WebMD merger in September 2000. Thus, it would still fall outside the limitations period.

[47]In an earlier filing, the government acknowledged that "stock sales were not part of the fraud conspiracy in Count 1. Stock sales were not mentioned in the manner and means section or within the many overt acts in furtherance of the fraud conspiracy." (Dkt. 526 at 13.) The government cannot reasonably argue that anything alleged in Paragraph 26 of the indictment could have been received after September 2000.

knowing and intentional receipt of criminal proceeds in this case that occurred during the limitations period.

Additionally, the Fourth Circuit's decision in <u>Weaver</u> is not helpful to the government's case either.  In <u>Weaver</u>, the robbery of the armored car produced jewelry and foreign currency.  <u>Weaver</u>, 1992 WL 138345, *6.  In that case, the conspiracy did not end because the district court could have reasonably concluded that until the "booty" was distributed, the conspiratorial objectives had not been achieved.  <u>Id.</u>  There is no analogy to the present case, primarily because there is no proof of any alleged "booty" that defendants had not yet received or even anticipated after September 2000.

Under the government's theories, which also recently include that defendants desired to permanently protect their enrichment and that they were set to receive a lingering economic benefit,[48] so long as any defendant retained one cent or one share of stock or retained any asset which was purchased by their ill-gotten gains, or did not confess to the crime, the conspiracy would be ongoing.  To accept the government's argument, no conspiracy would end until every conspirator no longer retained any economic benefit no matter how residual.  A drug conspiracy is illustrative of this point: a seller in a drug conspiracy receives money in exchange for the drugs.  So long as the seller keeps the money, or purchases and retains any asset by using the proceeds of the drug sale, the statute of limitations would never begin to run because they would be retaining the personal enrichment received from the conspiracy.  By contrast, when there is an identifiable or even

---

[48]The court notes that neither of these theories appears in the indictment, nor were they presented to the jury at trial.  From time to time, identifying the government's position on some issues in this case is often a bit like finding the lady in a game of Three-card Monte.

anticipated receipt of ill-gotten gains, and that is an overt act in furtherance of the conspiracy, the statute will begin to run.

The government argues that the overt acts of concealment are sufficient because defendants must have had some amorphous purpose to obtain personal enrichment. At the hearing, the government suggested that the conspiracy would have ended in 2003 because that is the last overt act charged. However, if the reason the conspiracy was ongoing in 2003 was because defendants hoped to obtain personal enrichment, and the overt acts are sufficient because they are acts of concealment during an ongoing conspiracy, then why would those acts serve as the endpoint of the conspiracy?[49] The conspiratorial objective of obtaining personal enrichment could not possibly be fulfilled by any act of concealment done in 2003.[50] The government's position is completely circular. The court finds it necessary to reiterate that under the government's theory of the case, the purpose of personal enrichment could never be fully obtained and would be permanently protected.

There was no evidence presented to the jury at trial that defendants received any stock options or personal enrichment because of the alleged fraud. Considering that this was

---

[49]At the hearing, the court specifically asked the government at what point the statute would have started to run. The government responded that it would have begun in 2003 and expired in 2008. Dkt. 1019, Hr'g Tr. at 59, April 13, 2010. The court does not understand how any act alleged to have occurred in 2003 ended this conspiracy other than the government saying so.

[50]Although this exercise would be more appropriate in a law school classroom, taking the government's theory to its logical extension, a plea of not guilty should be an act of concealment and payment of attorneys' fees through director and officer liability insurance, and/or the corporation paying the balance, is obtaining personal enrichment. This reasoning demonstrates the logic of the Supreme Court's consistent emphasis on defining limits to conspiracy law.

a successful, legitimate corporation, with hundreds of employees, the court cannot accept the de facto position that but for the conspiracy, defendants would not have received stock options. For instance, Mrs. Plumb testified that she received stock options while at the company. (Trial Tr. vol. 17, 3598, February 10, 2010.) Again, there is no contention that she was ever part of the alleged conspiracy. Mrs. Plumb also testified that she exercised her options and that a stock option plan was made available to employees. (Id.) In other words, there is simply no validity to the argument that because defendants received options, they must have obtained personal enrichment as the result of the ongoing conspiracy.

Additionally, there was no evidence as to the value of the stock options. Furthermore, there was no evidence that the value of the stock or stock options was inflated by defendants' alleged fraud. There was no evidence that any conspirator exercised his options. The government made little effort in this case to identify or prove that anything in fact resulted from this alleged conspiracy. The indictment charges defendants with attempting to obtain personal enrichment in the form of salary, bonuses, stock option grants, and capital appreciation of stock. (Indict. ¶ 26.) The government chose not to do an event analysis as to whether the fraud had any effect on the value of the stock at all. The government did not call a single witness or introduce any evidence that would suggest that the Synetic or WebMD mergers would not have occurred absent the allegedly overstated revenue.

The government made no attempt to show any failings in either defendant's job performance that would suggest they did not deserve or earn their salaries or bonuses, or that

these payments were somehow related to their allegedly fraudulent conduct.[51]  Additionally,

Mr. Sessions was a day or two away from retirement.  There is no evidence related to the

receipt of anything that Mr. Sessions may or may not have been entitled to as a result of his

retirement.  Even more strikingly, in 2003, WebMD had not employed Mr. Kang for two

years.[52]

Ultimately, the court declines the government's invitation to assume that the alleged

fraud produced ill-gotten gains just because it is fraud.  It is not this court's responsibility

to salvage the government's prosecution.  The government chose to indict, it chose to

prosecute, it chose what evidence to present, and, even after specific inquiry by the court,

---

[51]However, even if the government had, the court would not consider receipt of salary to be sufficient to extend the life of the conspiracy.  See United States v. Doherty, 867 F.2d 47, 61 (1st Cir. 1989).  In Doherty, then-Judge Breyer concluded that

> where receiving the payoff merely consists of a lengthy, indefinite series of ordinary, typically noncriminal, unilateral actions, such as receiving salary payments, *and* there is no evidence that any concerted activity posing the special societal dangers of conspiracy is still taking place, we do not see how one can reasonably say that the conspiracy continues.

Id. at 61. (emphasis in original).  At best, there is a reasonable inference, taking the evidence in the light most favorable to the government, that Mr. Sessions would have been paid for his remaining day or two at WebMD, and may have been scheduled to receive retirement benefits.  Although there is no actual evidence that he received anything, receipt at this point would have been the conclusion of a "lengthy, indefinite series of ordinary, typically noncriminal, unilateral actions."  Id. at 61.  There is no evidence that either defendant had any communication with the other or any other alleged member of the conspiracy.  Thus, there is no evidence that "any of the special societal dangers of [a] conspiracy" were present.  Further, at the time of Mr. Sessions' interview, the investigation only focused on Mr. Davids' kickback scheme.  (Trial Tr. vol. 21, 4457, February 17, 2010.)  Mr. Sessions would not have had any reason to fail to disclose any information to Mr. Glick because the evidence at trial established Mr. Sessions had no knowledge of the kickback scheme.

[52]The court notes that there is not even a reasonable inference that Mr. Kang could or would have been receiving anything at the time of his interview.  There is also no evidence that there was any enrichment of the type identified in Paragraph 26 of the indictment for Mr. Kang to protect in 2003.

it chose not to use expert analysis to prove any of the allegations with regard to the effect of the fraud, if any. The government made its bed and now it must lie in it. [53]

This court is required to find in favor of defendants' Rule 29 motion because this case is indistinguishable from controlling Supreme Court precedent. Moreover, in a case like this, to countenance the government's position that there was an express, original agreement to conceal, and/or that the conspiracy was ongoing because of conspiratorial objectives to conceal the conspiracy and to obtain personal enrichment, would eviscerate the boundaries of conspiracy law. This court simply cannot hold that Supreme Court case law, the statute of limitations, and general notions of fairness in our criminal justice system no longer have any meaning.

## IV. CONCLUSION

For the reasons set forth above, the court holds that defendants' convictions must be set aside and a judgment of acquittal be entered. Accordingly, defendants' motion pursuant to Federal Rule of Criminal Procedure 29 is **GRANTED**.

**AND IT IS SO ORDERED**.

---

[53]The court emphasizes that the responsibility for most of these decisions does not fall on the trial team. Many of the decisions in this case were made long before the involvement of these attorneys, and subsequently, many of the choices involved in decisions made later in the case were the result of those earlier decisions. Regardless, the basis for this order in no way reflects unfavorably on the efforts of the trial team, who obviously did an outstanding job prosecuting this case.

DAVID C. NORTON
CHIEF UNITED STATES DISTRICT JUDGE

May 27, 2010
Charleston, South Carolina