IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Criminal No. 2:05-CR-928-DCN |
| vs. | ) | |
| | ) | |
| JOHN H. KANG and | ) | |
| JOHN P. SESSIONS, | ) | **ORDER AND OPINION** |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

This matter is before the court on defendants' conditional motion for a new trial pursuant to Federal Rule of Criminal Procedure 33. The court entered an order granting defendants a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 on May 27, 2010 (Rule 29 Order), and defendants filed the instant motion to preserve their Rule 33 arguments in the event that the United States Court of Appeals for the Fourth Circuit reverses the Rule 29 Order. The government filed a response in opposition to defendants' motion. For the reasons set forth below, the court grants defendants' motion.

## I. BACKGROUND

The trial of both defendants began on January 19, 2010. Defendants faced the charge of conspiracy to commit mail, wire, and securities fraud in violation of 18 U.S.C. § 371. Violation of the statute explicitly requires proof of an overt act in furtherance of the conspiracy. See United States v. Bolden, 325 F.3d 471, 491 (4th Cir. 2003).

On February 18, 2010, after the government concluded its case, defendants filed a motion for judgment of acquittal pursuant to Rule 29. Defendants based this motion on "the government's failure to satisfy the statute of limitations." Conditional Mot. 2. The

1

next day, defendants made an oral Rule 29 motion arguing "a more generalized sufficiency-of-the-evidence" failure on the part of the government. Id. The court took both motions under advisement. On February 23, 2010, defendants rested without putting on a case.

On March 1, 2010, the jury found both defendants guilty. The court extended the deadline for filing any post-trial motions until ten days after it ruled on defendants' Rule 29 motions and forfeiture motions. On May 27, 2010, the court granted defendants' Rule 29 motions and denied as moot defendants' forfeiture motions. The court subsequently entered judgments of acquittal. Defendants filed a protective Rule 29 motion, and in the alternative, a protective Rule 33 motion within ten days of the May 27, 2010 order, and they filed the instant motion by consent of the parties and the court on June 25, 2010. Defendants argue that their motion should be granted for the following two reasons: (1) the lack of evidence that defendants participated in a conspiracy to commit accounting fraud "weighs heavily against the verdict" and (2) no overt acts in furtherance of the conspiracy occurred during the statute of limitations period. Conditional Mot. 1.

On July 16, 2010, the government filed a response in opposition raising three arguments. First, the government argues that it "need only demonstrate, by circumstantial evidence accompanied by fair inferences, that the conspirators had a tacit understanding to commit wrongdoing" and that an explicit or express agreement to commit a crime is not necessary. Resp. Opp'n 2. Second, the government argues that the jury's finding that overt acts in furtherance of the conspiracy occurred within the statute of limitations was consistent with the weight of the evidence. And third, the government argues that

defendants should be precluded from arguing that the statute of limitations instruction to the jury was inadequate because the court gave the instruction proposed by defendants.

## II.  DISCUSSION

Federal Rule of Criminal Procedure 29(d)(1) states:  "If the court enters a judgment of acquittal after a guilty verdict, the court must also conditionally determine whether any motion for a new trial should be granted if the judgment of acquittal is later vacated or reversed.  The court must specify the reasons for that determination."  Although defendants did not file a conditional motion for a new trial simultaneously with their original motion for judgment of acquittal, they timely filed a protective conditional motion for a new trial as well as the instant motion.

Federal Rule of Criminal Procedure 33(a) permits a court, upon motion by a defendant, to "vacate any judgment and grant a new trial if the interest of justice so requires."

> A new trial is a drastic remedy intended for the rare case.  Indeed, "[w]e have held that a district court should exercise its discretion to grant a new trial 'sparingly' and that the district court should grant a new trial based on the weight of the evidence 'only when the evidence weighs heavily against the verdict.'"  United States v. Wilson, 118 F.3d 228, 237 (4th Cir. 1997) (quoting United States v. Arrington, 757 F.2d 1484, 1486 (4th Cir. 1985)).  The district court should examine all the evidence introduced at trial and—unlike when ruling on a motion for acquittal—the court may evaluate for itself the credibility of witnesses.  Arrington, 757 F.2d at 1485.  But a court should not lightly substitute its judgment for that of the jury.  Only "[w]hen the evidence weighs so heavily against the verdict that it would be unjust to enter judgment" should the court grant a motion for a new trial.  Id.

United States v. Chin, No. 96-4826, 1999 WL 333137, at *1 (4th Cir. May 26, 1999).

> When the motion attacks the weight of the evidence, the court's authority is much broader than when it is deciding a motion to acquit on the ground of

> insufficient evidence. In deciding a motion for a new trial, the district court is not constrained by the requirement that it view the evidence in the light most favorable to the government.

Arrington, 757 F.2d at 1485. The court may draw inferences unfavorable to the government from the evidence. United States v. Campbell, 977 F.2d 854, 860 (4th Cir. 1992).

When considering a Rule 33 motion, a district court is owed "great deference" because it sits, in effect, as a "thirteenth juror." United States v. Wolff, No. 89-5551, 1989 WL 152513, at *8 (4th Cir. Dec. 12, 1989). "A trial judge's superior vantage point is nowhere more certain than in assessing the overall dynamics of a trial, including . . . the overall 'weight' of the evidence." Id. at *9. The district court must be cautioned, however. "A district court 'judge is not a thirteenth juror who may set aside a verdict merely because he would have reached a different result.'" United States v. Rivera Rangel, 396 F.3d 476, 486 (1st Cir. 2005) (quoting United States v. Rothrock, 806 F.2d 318, 322 (1st Cir. 1986)).

Applying the standards above to the evidence in this case, the court finds that the evidence weighs heavily against the jury verdict and, therefore, in favor of granting defendants' conditional motion for a new trial. Specifically, the court finds that the evidence weighs heavily against a determination that defendants committed acts within the statute of limitations period and that they participated in the alleged conspiracy. Many, if not all, of the reasons in support of the court's findings can be found in the detailed, forty-three-page Rule 29 Order granting defendants' motion for judgment of acquittal. Instead of restating the entire order, the court will reference pertinent portions

to satisfy the analysis required here.

> **A.    The Government's Failure to Prove that Defendants Committed Overt Acts in Furtherance of the Conspiracy Within the Statute of Limitations Weighs Heavily Against the Verdict**.

"'To constitute an overt act for purposes of the statute of limitations, the act must involve some affirmative conduct or deliberate omission on the part of [the coconspirators].'"  Order 9 (quoting United States v. Ben Zvi, 242 F.3d 89, 97 (2d Cir. 2001)).  The only overt acts alleged by the government occurring after December 15, 2000, and within the statute of limitations period are statements made by defendants to a WebMD lawyer, Michael Glick, in July and August 2003.  The government alleges that during the interviews, defendants either concealed the nature of the accounting fraud occurring at Medical Manager or gave false statements regarding accounting practices used in Medical Manager's acquisitions.  During the trial, Mr. Glick testified regarding the interviews.

In July 2003, Mr. Glick interviewed defendant John Sessions.  Mr. Glick asked Mr. Sessions about the acquisition and subsequent release of a company called Raven.  Mr. Glick testified that "Mr. Sessions voluntarily and openly discussed the matters on which he was being asked.  Mr. Glick was not aware of Mr. Sessions not telling the truth or attempting to conceal anything."  Order 10-11 (citing Trial Tr. vol. 21, 4446, February 27, 2010).  "Mr. Glick ultimately concluded that Mr. Sessions had a 'mis-recollection' of the Raven transaction and formed no other conclusion regarding Mr. Sessions and that particular transaction."  Id. at 11 (quoting Trial Tr. vol. 21 at 4448).  "Mr. Glick testified that he 'found no evidence in talking to John that he was not, that he was concealing the

truth, and not telling the truth, I think I, if so from that standpoint, and I found no evidence that – I found no evidence that he perpetrated a fraud.'" Id. (quoting Trial Tr. vol. 21 at 4451).

In August 2003, Mr. Glick interviewed defendant John Kang. At that time, Mr. Kang no longer worked for WebMD and could not be compelled to participate; however, he voluntarily appeared for the interview. Id. "Mr. Kang answered all questions asked of him and never refused to answer a question." Id. (citing Trial Tr. vol. 21 at 4452). "During the interview, Mr. Kang informed Mr. Glick that Bobby Davids came up with the idea for 'the simultaneous sale of software along with the acquisition of a company.'" Id. (quoting Trial Tr. vol. 21 at 4433). Mr. Kang did not recall the Raven transaction.

When asked about "'the use of improper accounting to create artificial deferred revenue on the books of the companies that Medical Manager was acquiring,'" Mr. Kang stated that he was unaware of any such improper accounting, he believed that the books of the acquired companies were accurate,[1] and his belief was based on the outside accountants, upon whose expertise he relied. Id. at 12 (quoting Trial Tr. vol. 21 at 4438).

---

[1] In the Rule 29 Order, the undersigned noted that Mr. Kang's responses to Mr. Glick's questions were "eerily reminiscent of the factual statement Mr. [Michael] Singer filed along with his Deferred Prosecution Agreement." Order 12 n.17. Mr. Singer was the lead defendant in this case and was alleged by the government to be the "mastermind of the alleged conspiracy." Id. at 4-5 n.6. Mr. Singer, who has a bachelor's degree in business and master's degree in economics, submitted a statement regarding Medical Manager's bulk software sales, conveying his belief that at the time of the sales, they complied with Generally Accepted Accounting Principles (GAAP), thus negating "any criminal intent or knowledge as to the unlawful purpose of the alleged conspiracy, hence a basis for his deferred prosecution agreement." Id. The record at trial reflected that Mr. Kang and Mr. Sessions, like Mr. Singer, had no training or background in accounting or any expertise in GAAP requirements.

Mr. Kang told Mr. Glick that "the certification he signed during restatement weekend was accurate and that he was not aware of other transactions that needed restatement." Id. (citing Trial Tr. vol. 21 at 4443). At trial, despite the fact that WebMD was aware that many officers and employees of Medical Manager had been indicted and several had pleaded guilty, Mr. Glick testified that WebMD "never concluded that it needed to take any legal action against Mr. Kang." Id. (citing Trial Tr. vol. 21 at 4457).

This court found that the overt acts that defendants allegedly committed were "their failure to immediately and voluntarily confess to Mr. Glick that they participated in an accounting fraud conspiracy," while at the same time stating "that they may have engaged in business activity to increase productivity and profits or sales at Medical Manager." Id. at 13. In the context of defendants' Rule 29 motion, the court considered the above information in the light most favorable to the government and assumed *arguendo* that the Glick interviews constituted overt acts. Id. at 14. The court is not required to do so in consideration of the instant motion, and the court finds that the Glick interviews are of little evidentiary weight and fail to establish any wrongdoing on the part of defendants, much less any acts made in furtherance of the alleged original conspiracy.

Next, this court found that the case of Grunewald v. United States, 353 U.S. 391 (1957), dictated that the court grant defendants' Rule 29 motion. In Grunewald, the Supreme Court "rejected the 'proposition that the duration of a conspiracy can be indefinitely lengthened merely because the conspiracy is kept a secret, and merely because the conspirators take steps to bury their traces, in order to avoid detection and punishment after the central criminal purpose has been accomplished.'" Order 16

(quoting Grunewald, 353 U.S. at 405). "The Court stated that 'a vital distinction must be made between acts of concealment done in furtherance of the main criminal objectives of the conspiracy, and acts of concealment done after these central objectives have been attained, <u>for purposes only of covering up after the crime</u>." Id. at 21 (quoting Grunewald, 353 U.S. at 405). Furthermore, Grunewald requires: (1) direct evidence of the alleged conspiracy, (2) an original, express agreement to participate in the conspiracy, and (3) the agreement "'must be to act in concert in order to cover up, for their own self-protection, traces of the crime after its commission.'" Id. (quoting Grunewald, 353 U.S. at 404).

The government argued that there was an express agreement to conceal; however, this court found a complete absence of direct evidence in the record to support that argument. "[N]ot only is there no direct evidence of an express, original agreement to conceal, there was no direct evidence of an express, original agreement to do anything." Order 23.

> Mr. Davids testified that he never had any kind of an agreement to do anything wrong at Medical Manager with either defendant. (Trial Tr. vol 8, 1754, January 28, 2010.) Mr. Kevin Kennedy, another government witness and participant in Davids' kickback scheme, also testified that he did not have any agreement to do anything wrong with Mr. Kang. (Trial Tr. vol. 15, 3104, February 8, 2010.) Moreover, Mr. Maxie Juzang, a defendant indicted in the Second Superseding Indictment, testified that he never conspired with Mr. Sessions, he never committed a crime, and Mr. Sessions never told him to do anything improper, illegal or wrong. (Trial Tr. vol. 13, 2658-2670, February 4, 2010.)

Order 23-24 (footnotes omitted). "Mr. Juzang's testimony that there was no agreement means that the government necessarily would have to rely on circumstantial evidence to support any argument that there was an express agreement to conceal—reliance on which

8

is clearly prohibited by Grunewald." Id. at 24. "Even taking the evidence in the light most favorable to the prosecution, the government's case barely supports an implied agreement to commit accounting fraud." Id.

In the Rule 29 Order, this court reached the conclusion that the three main conspiratorial objectives—all "center[ed] around the allegedly fraudulent accounting practices"—were accomplished by "September 15, 2000, the date of the WebMD merger, because there was no evidence at trial of any acts related to the alleged conspiracy after that date." Order 28-29. In addition, this court held that "[n]o rational trier of fact could conclude that post-September 2000 acts of concealment were done in furtherance of the original objectives. The overt acts found by the jury are meaningless because they are not within the scope of the original conspiratorial agreement." Id. at 29. No testimony indicated that defendants or their alleged coconspirators sought to conceal anything from anyone outside of Medical Manager. Id. at 30-35. As for the personal enrichment objective of the alleged conspiracy, this court found "absolutely no evidence that any . . . [personal enrichment, if any,] occurred after the WebMD merger in September 2000." Id. at 37 n.46.

> Under the government's theories, which also recently include that defendants desired to permanently protect their enrichment and that they were set to receive a lingering economic benefit, so long as any defendant retained one cent or one share of stock or retained any asset which was purchased by their ill-gotten gains, or did not confess to the crime, the conspiracy would be ongoing. To accept the government's argument, no conspiracy would end until every conspirator no longer retained any economic benefit no matter how residual.

Id. at 38. There was no evidence presented to the jury at trial reflecting that defendants

received any form of personal enrichment or stock options. "The government chose not to do an event analysis as to whether the fraud had any effect on the value of the stock at all." Id. at 40. There was no evidence presented showing that defendants did not legitimately earn their salaries, bonuses, or in the case of Mr. Sessions, his retirement.

In light of the scant, if not nonexistent, evidence presented by the government, and the requirements set forth in Grunewald, the court finds that the government's failure to prove that defendants committed overt acts in furtherance of the conspiracy within the statute of limitations period weighs heavily against the verdict and that defendants should be granted a conditional new trial based on this ground.

> **B.     The Lack of Evidence that Defendants Participated in the Alleged Conspiracy to Commit Accounting Fraud Weighs Heavily Against the Verdict.**

The court agrees with defendants' assertion that the lack of evidence that defendants participated in the alleged conspiracy weighs heavily against the verdict. The government's reference to Mr. Davids' testimony that he had an "understanding" with defendants to commit accounting fraud and to conceal that fraud during Restatement Weekend is without substance. Resp. Opp'n 8. This case came to light after WebMD had discovered Mr. Davids' personal kickback scheme. Only then did Mr. Davids reveal this totally unrelated alleged conspiracy and agree to cooperate with the Federal Bureau of Investigation (FBI), in order to minimize the criminal consequences of his multi-million dollar theft. His motivation and credibility are clearly at issue.

Defendants accurately describe Mr. Davids' testimony as "filled with broad generalizations, rampant speculation, and unfounded assumptions that were each

thoroughly debunked upon cross-examination." Reply 5. "After five years of debriefing, reviewing documents with the government, interviews, and trial preparation, it would have been a waste of judicial resources to actually count the number of times Mr. Davids was unable to provide a concrete answer to defense counsel's questions some thirteen years after the fact." Order 8 n.11. Mr. Davids testified that he did not receive a call from either defendant instructing him to conceal information during the course of Restatement Weekend, which occurred in August 1999. Trial Tr. vol. 8, 1753, January 28, 2010.

The government claims that an email between Mr. Davids and Mr. Sessions establishes the fraudulent purpose of the circular software sales. Ex. PR 013. According to the government:

> [i]n that email, sent within two months of the Synetic merger, Davids confirmed to Sessions that the amount of simultaneous software sales in two deals (Venture and CSC) were increased "with the intent of securing the financial results necessary for the quarter" further explaining that one of the deals "was actually increased twice." Within three months, Sessions signed a certification disclaiming any knowledge that there were any transactions in 1997 through 1999 that did not comply with generally accepted accounting principles. GEN 012A.

Resp. Opp'n 7. The government accuses defendants of "arbitrarily and artificially manipulating sham simultaneous software sales 'with the intent of securing the financial results necessary for the quarter.'" Id. As with Mr. Kang, there was no evidence that Mr. Sessions knew anything about accounting or GAAP. In addition, Mr. Davids, who is a certified public accountant (CPA), testified that he informed defendants and management that Mr. Hanlon, Medical Manager's independent outside accountant, had approved bulk

software sales to Monette and ProMed, and the sale involved with the acquisition of CSC was substantially similar. Trial Tr. vol. 7, 1661, January 27, 2010. Defendants' lack of accounting expertise and their reliance on Mr. Hanlon's approval of the way they were conducting business and managing earnings negates any criminal intent or knowledge regarding the software sales.[2] There is not a distinction nor a difference between defendants' knowledge of bulk software sales and GAAP and that contained in Mr. Singer's affidavit.

The testimony of Caroline Bembry likewise fails to establish that defendants participated in a conspiracy to commit and conceal accounting fraud. While this court made clear that taken in the light most favorable to the government Ms. Bembry's testimony edged the government's case over the Rule 29 sufficiency hurdle (Order 25), it

---

[2]The government also contends that the actions of Mr. Kang in the Companion and Lee Data acquisitions demonstrate how he and Mr. Davids "acted in concert to achieve an illegal" goal by conducting a bulk software sale in the case of Companion, and by executing a secret side agreement, in violation of the "pooling of interests" method of accounting, in the Lee acquisition. Resp. Opp'n 5.

In the Rule 29 Order, this court found that "[t]here is no evidence in the record as to Mr. Kang's background or expertise in accounting matters." Order 12 n.16. And as noted above, Mr. Hanlon understood the justification for such sales and approved other simultaneous bulk software sales. The government argues that Mr. Davids misled Mr. Hanlon into approving these sales, but there was no evidence that Mr. Kang or Mr. Sessions knew that Mr. Hanlon had been misled or that they had agreed that Mr. Davids should mislead Mr. Hanlon.

With regard to the Lee Data acquisition, defendants raise three points that negate the argument raised by the government. First, the agreement itself, Government Exhibit LD008, states that a right of first refusal arose only when Medical Manager could sell the property and it would not "violate the pooling of interests business combination." Second, Mr. Davids' testimony shows that he did not intend to violate pooling through this agreement. Trial Tr. vol. 7 at 1496. Third, the government presented no expert testimony that the side agreement constituted a pooling violation.

fails to satisfy the court's credibility assessment under Rule 33.  Ms. Bembry, who entered an agreement with the government not to be prosecuted, is a CPA and was a paramour of Mr. Davids.  She "testified that Bobby Davids was her point of reference for the assertion that everyone 'knew' about the allegedly improper accounting practices at Medical Manager and that Mr. Davids was her primary contact for the acquisition accounting."  Order 25 n.34 (citing Trial Tr. vol. 18, 3893, 3933-41, February 11, 2010).  At trial, Ms. Bembry parroted what she was told by Mr. Davids; Ms. Bembry was Charlie McCarthy to Mr. Davids' Edgar Bergen.  Ms. Bembry could only say that "'a wink and a nod' type of agreement" existed between defendants and other alleged conspirators, "an understanding of this is what we need to make the numbers, to make it happen."  Id. at 25 (quoting Trial Tr. vol. 17, 3677, 3682-83, February 10, 2010; Trial Tr. vol. 18 at 3983).  Her testimony does not support an express agreement to commit accounting fraud, "especially considering that she was not even sure in the beginning that the transactions were not legitimate."  Id. (citing Trial Tr. vol. 18 at 3919-20, 3932, 3952-55, 3962-73).

      The government asserts that a conversation between Ms. Bembry and Mr. Kang following a "forecast meeting" in 1999 reflects that he was a participant in the alleged conspiracy.  Resp. Opp'n 11.  Mr. Kang allegedly stated to Ms. Bembry that she needed to contact Mr. Davids to tell him that "we need some more money."  Trial Tr. vol. 18 at 3877.  Ms. Bembry testified that she never attended a forecast meeting and admitted that she could only speculate as to what occurred during those meetings.  Trial Tr. vol. 18 at 3937-38, 3963.  Information supplied by Mr. Davids, speculation, and an alleged "wink and a nod" agreement does not lead to the conclusion that Mr. Kang's statement meant

anything other than that he wanted Mr. Davids to fulfill his role as head of mergers and acquisitions to generate more revenue for Medical Manager so that the company could make its quarterly numbers.³ Likewise, Ms. Bembry's statements regarding Restatement Weekend and Mr. Kang's alleged presence during a conversation about restating

---

³The government's accusations in this care are similar to those in United States v. Goyal, No. 08-10436, 2010 WL 5028896, at *1 (9th Cir. Dec. 10, 2010). In Goyal, the government alleged that the defendant, the chief financial officer of Network Associates, Inc., violated GAAP by "recognizing revenue from certain software sales earlier than it should have" and concealed the improper accounting method from outside auditors. Id. The government also alleged that the defendant misstated revenue in its reports to the Securities and Exchange Commission. Id. A jury convicted Goyal of committing multiple counts of securities fraud and making false statements to auditors, and the district court denied Goyal's Rule 29 motion for judgment of acquittal. Id. at *2.

The Ninth Circuit reversed the district court's denial of Goyal's Rule 29 motion for judgment of acquittal. Goyal, 2010 WL 5028896, at *9. The Ninth Circuit held that no reasonable juror, viewing the evidence in the light most favorable to the government, could have found Goyal guilty beyond a reasonable doubt. Id. As the Ninth Circuit noted,

> Goyal's desire to meet NAI's revenue targets, and his knowledge of and participation in deals to help make that happen, is simply evidence of Goyal's doing his job diligently. See, e.g., Anderson v. First Sec. Corp., 249 F. Supp. 2d 1256, 1270 (D. Utah 2002) (effort "to meet analysts' numbers and not disappoint Wall Street is merely an example of a company's shared motives to look good" that does not imply "that the company was engaged in fraudulent conduct"). Similarly, Goyal's presumed knowledge of GAAP as a qualified CFO does not make him criminally responsible for his every conceivable mistake. If simply understanding accounting rules or optimizing a company's performance were enough to establish scienter, then any action by a company's chief financial officer that a juror could conclude in hindsight was false or misleading could subject him to fraud liability without regard to intent to deceive. That cannot be. Cf. Merck & Co., Inc. v. Reynolds, 559 U.S. ----, 130 S. Ct. 1784, 1796-97, 176 L. Ed. 2d 582 (2010) (holding that "facts that tend to show a materially false or misleading statement" do not always suffice "to show scienter as well").

Id. at *6.

transactions did not establish Mr. Kang's knowledge of any accounting fraud. Her interpretation that only certain transactions would be restated in order to perpetrate a fraud is simply that—an interpretation. If the conversation occurred, the conversation could just as easily be interpreted as meaning that only certain transactions were *required* to be restated. Ms. Bembry's testimony was simply not credible enough to support that defendants participated in the alleged conspiracy or that Mr. Kang wanted Mr. Davids to commit accounting fraud.[4] The lack of credible evidence that defendants participated in the alleged conspiracy to commit accounting fraud weighs heavily against the verdict.[5]

---

[4] At trial, Ms. Bembry testified several times that she did not feel as though she was set up by Mr. Davids when he arrived at their scheduled lunch in 2003 accompanied by FBI Special Agents. Trial Tr. vol. 17 at 3704; Trial Tr. vol. 18 at 3852. The court recognizes that it was not appropriate to consider the impact of this testimony on Ms. Bembry's credibility for purposes of defendants' Rule 29 motion; however, for purposes of the Rule 33 motion, the court is not so constrained.

No reasonable individual, especially one who apparently believed she had participated in a conspiracy to commit accounting fraud, could credibly state that she did not feel set up or ambushed considering the surrounding circumstances. Ms. Bembry testified that her intimate relationship with Mr. Davids ended shortly after she left Medical Manager in 1999. Trial Tr. vol. 17 at 3704-05. After numerous phone conversations between Ms. Bembry and Mr. Davids, he invited her for a long lunch in 2003, at which time he arrived at the restaurant with FBI Special Agents in tow. Trial Tr. vol. 18 at 3851. She then testified: "I mean I just felt like [Mr. Davids] was saying, 'They are here to ask you some questions. Answer.' That's – that was it. I didn't feel like I was being set up." Trial Tr. vol. 17 at 3704. Ms. Bembry's repeated statements that she did not feel that she was set up are simply not believable. Ms. Bembry's entire testimony was based on what she was told by Mr. Davids, as well as her speculation and her interpretation; she further destroyed her own credibility with this repeated testimony. Moreover, Ms. Bembry's credibility is further damaged by the fact that she testified to the existence of an amorphous "wink and a nod" agreement to defraud among defendants, yet denied any knowledge of Mr. Davids' separate multi-million dollar defrauding of defendants and Medical Manager.

[5] Even though Goyal involved a Rule 29 motion, like this court's findings in the instant case, the Goyal court found that the government's allegations were unsupported by

### C. The Absence of a <u>Grunewald</u> Jury Charge Serves as an Alternative Basis Entitling Defendants to a New Trial.

The government and defendants dispute whether defendants should be granted a new trial due to the absence of a jury charge based on the "express agreement to conceal" holding in <u>Grunewald</u>. Order 24. This court's Rule 29 Order acknowledged that <u>Grunewald</u> requires: (1) direct evidence of the alleged conspiracy, (2) an original, express agreement to participate in the conspiracy, and (3) the agreement "'must be to act in concert in order to cover up, for their own self-protection, traces of the crime after its

---

evidence, or were based on conclusion or speculation. <u>Goyal</u>, 2010 WL 5028896, at *2-9. As such, this court finds the following comments made by Chief Judge Kozinski in his concurring opinion particularly appropriate in the instant case:

> This case has consumed an inordinate amount of taxpayer resources, and has no doubt devastated the defendant's personal and professional life. The defendant's former employer also paid a price, footing a multimillion dollar bill for the defense. And, in the end, the government couldn't prove that the defendant engaged in <u>any</u> criminal conduct.
>
> . . . .
>
> [C]riminal law should clearly separate conduct that is criminal from conduct that is legal. This is not only because of the dire consequences of a conviction—including disenfranchisement, incarceration and even deportation—but also because criminal law represents the community's sense of the type of behavior that merits the moral condemnation of society.
>
> . . . .
>
> [T]he trial judge should have dismissed the case when the prosecution rested and it was clear the evidence could not support a conviction. Although we now vindicate Mr. Goyal, much damage has been done. One can only hope that he and his family will recover from the ordeal. And, perhaps, that the government will be more cautious in the future.

<u>Id.</u> at *9-10 (Kozinski, C.J., concurring) (internal citations omitted); <u>see also</u> Order 3-4 n. 5.

commission.'" Order 21 (quoting Grunewald, 353 U.S. at 404). The court finds that the statute of limitations jury charge issued at the trial, while not incorrect, was incomplete in light of Grunewald. Indeed, the "charge left it open for the jury to convict even though they found that the acts of concealment were motivated purely by the purpose of the conspirators to cover up their already accomplished crime." Grunewald, 353 U.S. at 414.

Defendants are correct in pointing out that at the time of the charge conference, the government was aware of the Grunewald issues affecting its case. The government acknowledged that "the vast majority of overt acts fall prior to December 15, 2000"; however, it never requested an instruction that would give the jury clear guidance as to what the government must prove to qualify the interviews by Mr. Glick as overt acts occurring within the statute of limitations period. Trial Tr. vol. 23, 4930-31, February 22, 2010. In fact, when defendants raised this very issue, that a separate conspiracy instruction may be required by Grunewald, the government asserted that no such instruction was necessary. Trial Tr. vol. 24, 5006, February 23, 2010. The government took issue with a separate instruction, arguing simply that "it's about variance from what's proved from what's in the indictment. The concealment stuff is alleged in the indictment. That I don't think would support the basis for some sort of variance." Id. The court took this issue under advisement prior to issuing the Rule 29 Order.[6] Id.

Considering the government's position at that time, it is difficult to find any merit in the government's current position, placing blame on defendants for failing to request a Grunewald jury charge and invoking the "invited error doctrine." Resp. Opp'n 13-14.

---

[6]The court recognized the merits of defendants' argument at the time it was made.

The "invited error doctrine" does not apply when the "interests of justice demand otherwise," as in the situation where the government bears as much fault as the defendant. United States v. Barrow, 118 F.3d 482, 491 (6th Cir. 1997). Such is the case here. The government cannot be allowed to oppose a separate Grunewald jury charge prior to the completion of trial, and then place fault on defendants for not requesting a specific charge based on Grunewald afterward.

The jury charge concerning the statute of limitations did not require that the government prove an original, express agreement to conceal to qualify the Glick interviews as overt acts occurring within the limitations period. The jury charge also did not explain what it meant that the "conspiracy was still in existence." Trial Tr. vol. 24 at 5046-49. As a result, the court agrees with defendants that "the jury could have concluded that the conspiracy was 'still in existence' at the time of the Glick Interviews based on nothing more than a finding that, during those interviews, the Defendants concealed their prior, alleged fraud." Reply 15. Based on the instruction given, it is simply impossible to tell whether the jury made the findings necessary to convict the defendants in this case. Thus, the absence of a jury charge satisfying the requirements of Grunewald serves as another basis on which defendants are entitled to a new trial.

### IV. CONCLUSION

For the reasons set forth above, the court **GRANTS** defendants' conditional motion for a new trial.[7] As the undersigned noted in the Rule 29 Order, the court bases

---

[7] Perhaps this order may be the final act of the WebMD saga, which began amidst the white hot media coverage of corporate scandals at Enron, WorldCom, Tyco, and Global Crossing. If so, the court will presumptuously paraphrase the final lines of the The

its decision on the weaknesses of the case and not the efforts of the government's counsel or investigative agencies, and it in no way reflects unfavorably on these men and women who did an outstanding job investigating and prosecuting this case; their performance was exemplary.

      **AND IT IS SO ORDERED**.

 

_____
**DAVID C. NORTON**
**CHIEF UNITED STATES DISTRICT JUDGE**

**January 19, 2011**
**Charleston, South Carolina**

---

Hollow Men, a poem written by T.S. Eliot in 1925:

> *This is the way WebMD ends*
> *This is the way WebMD ends*
> *This is the way WebMD ends*
> *Not with a bang but a whimper*.